Joshua H. Reisman, Esq.
Nevada Bar No. 7152
Robert R. Warns III, Esq.
Nevada Bar No. 12123
REISMAN SOROKAC
8965 South Eastern Avenue, Suite 382
Las Vegas, Nevada 89123
Telephone: (702) 727-6258
Facsimile: (702) 446-6756
Email: jreisman@rsnvlaw.com
Email: rwarns@rsnvlaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | | |
|---|---|---|
| NASSER MORADI, RICHARD BUCKMAN, DOUGLAS TOMLINSON, and MATT ABBEDUTO,  Derivatively on Behalf of LAS VEGAS SANDS CORP., | § § § § § | CIVIL ACTION NO. 11-CV-00490-GMN-RJJ Base case consolidated with 11-CV-00595-GMN-RJJ and 11-CV-00636-GMN-RJJ |
| Plaintiffs, | § § | |
| vs. | § § § | **CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| SHELDON GARY ADELSON, MICHAEL A. LEVEN, CHARLES D. FORMAN, IRWIN A. SIEGEL, IRWIN CHAFETZ, GEORGE P. KOO, JEFFREY H. SCHWARTZ, JASON N. ADER , and WING T. CHAO | § § § § § § | **JURY DEMAND** |
| Individual Defendants. | § § | |
| – and – | § § | |
| LAS VEGAS SANDS CORP., a Nevada corporation, | § § § | |
| Nominal Defendant. | § § | |

/ / /

/ / /

1

1 | **CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

2         Plaintiffs, by their attorneys, submit this Consolidated Verified Shareholder Derivative

3 Complaint (the "Complaint") against the defendants named herein.

4     **I.**        **JURISDICTION AND VENUE**

5         1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2)

6 because complete diversity exists between the plaintiffs and each defendant and the amount in

7 controversy exceeds $75,000 exclusive of interest and costs.  Plaintiffs are citizens of Maryland,

8 Florida, Kansas, and Illinois.  Defendants are citizens of Massachusetts, Nevada, and New York.

9 This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that

10 are so related to claims in the action within such original jurisdiction that they form part of the same

11 case or controversy under Article III of the United States Constitution.  This action is not a collusive

12 action designed to confer jurisdiction on a court of the United States that it would otherwise not

13 have.

14         2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this

15 case involves alleged violations of federal law by the defendants of the Foreign Corrupt Practices

16 Act of 1977, as amended, 15 U.S.C. §§ 78dd-1, et seq.

17         3.      This Court has jurisdiction over each defendant named herein because each defendant

18 is either a corporation that conducts business in and maintains operations in this District, or is an

19 individual who has sufficient minimum contacts with this District so as to render the exercise of

20 jurisdiction by the District courts permissible under traditional notions of fair play and substantial

21 justice.

22         4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1401 and 28 U.S.C. § 1391(a)

23 because: (i) nominal party Las Vegas Sands Corp. ("Sands" or the "Company"), maintains its

24 principal place of business in this district; (ii) one or more defendants either resides in or maintains

25 executive offices in this district; (iii) a substantial portion of the transactions and wrongs complained

26 of herein, including the defendants' primary participation in the wrongful acts detailed herein, and

1    aiding and abetting and conspiracy in violation of fiduciary duties owed to Sands, occurred in this

2    District; and (iv) defendants have received substantial compensation in this District by doing

3    business here and engaging in numerous activities that had an effect in this District.

4    **II.        NATURE AND SUMMARY OF THE ACTION**

5            5.      This is a shareholder derivative action on behalf of nominal party Sands, a Las Vegas-

6    based multi-use resort-development company.  Sands develops multi-integrated resorts throughout

7    the world.  Sands operates resorts in Nevada, Pennsylvania, Singapore, and Macau – a special

8    administrative region of the People's Republic of China ("PRC").  Its developments include The

9    Venetian Resort Hotel Casino, The Palazzo Resort Hotel Casino, and The Sands Expo and

10   Convention Center located in Las Vegas, Nevada and Marina Bay Sands in Singapore.  In addition,

11   through its majority-owned subsidiary, Sands China Limited ("SCL"), the Company owns several

12   destination properties in Macau, including The Venetian Macao Resort Hotel, Sands Macao Hotel,

13   Four Seasons Hotel Macao, and The Four Seasons Apartments located in the Cotai Strip in Macau.

14          6.      Defendants are the members of Sands' Board of Directors – Michael A. Leven,

15   Charles D. Forman, Irwin A. Siegel, Irwin Chafetz, George P. Koo, Jeffrey H. Schwartz, Jason N.

16   Ader, Wing T. Chao-and the Company's Chief Executive Officer, Sheldon Gary Adelson, who is

17   also a member of the Sands Board of Directors ("Board").

18          7.      This action arises from defendants' authorizations for Sands to conduct its business

19   and operations in foreign countries-some of which are generally perceived as having less developed

20   legal and regulatory frameworks and/or cultures in which requests for improper payments are not

21   discouraged-without installing and maintaining the internal controls and accounting systems

22   necessary for Sands to comply with the requirements of the Foreign Corrupt Practices Act ("FCPA"),

23   including its books and records provisions.

24   / / /

25   / / /

26   / / /

8.     As a result, Sands has been exposed to and has become the subject of costly investigations, including by the U.S. Department of Justice ("DOJ") and U.S. Securities and Exchange Commission ("SEC"), for possible violations of the FCPA.

9.     The FCPA makes it unlawful for covered companies such as Sands to make improper payments to foreign officials to obtain or retain business.  To prevent such bribes and kickbacks from occurring, the FCPA requires that covered companies establish and maintain a system of accounting controls to ferret out and ultimately prevent such illicit payments.  Non-compliance with the FCPA may result in fines, sanctions, and other adverse actions, including exposing the Company to civil liability.  Because Sands operates in some countries that involve a higher than normal risk of violations of the anti-corruption laws, including the FCPA, the Sands Board had a fiduciary duty to install and maintain internal controls and accounting system for compliance with the FCPA.  As defendants admitted in the Company's most recent Form 10-K, "[a]ny violation of the [FCPA] … could have a negative impact on [the Company]."

10.     In addition, as a Company incorporated and headquartered in Nevada, Sands is subject to Nevada gaming regulations.  Under such regulations, the Company is expressly prohibited from engaging in any activity or entering into any "unsuitable" associations that reflect or tend to reflect discredit or disrepute upon the State of Nevada or gaming in Nevada, or is otherwise contrary to Nevada gaming policies.  The foregoing regulation, among other things, was enacted by the state to rid Las Vegas of the influences of organized crime.

11.     The details about the investigation into Sands' business practices and possible violations of the FCPA have been closely guarded and not fully disclosed to Sands' shareholders.  Consequently, Sands shareholders have been kept in the dark about the precise nature and scope of the Company's possible liability for violations of the FCPA.  Nonetheless, the facts known to date reveal defendants' of their fiduciary duties and significant damages suffered by Sands as a result.

12.     Since its inception in 1988, Sheldon G. Adelson ("Adelson"), Sands' current Chief Executive Officer ("CEO"), Chairman of the Board ("Chairman"), and controlling shareholder, has

firmly controlled and essentially exercised personal autonomy over the operations and management of the Company.  Defendant Adelson has remained a controlling shareholder, Chairman, and CEO since the Company's initial public offering in 2004 and, as such, possesses unyielding influence over the Company's Board membership and executive appointments and their respective remunerations. Indeed, as defendants admit in the Company's FY2010 Form 10-K filed March 1, 2011, defendant Adelson "exercises significant influence over [Sands'] business policies and affairs, including the composition of [the] Board of Directors and any action requiring the approval of [the Company's] stockholders, including the adoption of amendments to [the Company's] articles of incorporation and the approval of a merger or sale of substantially all of [its] assets."

13.     Defendant Adelson's power and influence over the Company, executives, and the Board is demonstrated by his dismissal and/or forced resignation of two top Sands and SCL executives in the last three years as a result of their objections to his management of the Company. In March of 2009, defendant Adelson unilaterally forced the resignation of William P. Weidner ("Weidner"), the then President and Chief Operating Officer ("COO") of Sands who had been with the Company for over fourteen years, without even holding a full meeting and discussion of the Board members in advance.  Soon after, Steven C. Jacobs ("Jacobs"), the then CEO of SCL, was dismissed for objecting and/or refusing to comply with defendant Adelson's demands to engage in illicit business practices that would have violated the FCPA.  Ultimately, defendant Adelson's abrupt and unwarranted termination of Jacobs, and the ensuing litigation to follow, would expose the defendants' pervasive breach of fiduciary duties and blatant violations of the FCPA and the Nevada gaming regulations.

14.     Despite the importance of the Company's compliance with the FCPA and the Nevada gaming regulations to its operations, defendants knowingly, recklessly, and/or with gross negligence caused the Company to violate the applicable provisions in order to obtain favorable business results for the Company.  In particular, defendant Adelson directly instructed Jacobs and the Company to: (i) use "improper leverage" against senior Macau government officials in order to obtain a

concession from the Macau government to sell strata-title[1] to The Four Seasons Apartments; (ii) improperly induce Chinese banks to influence senior Macau government officials into allowing the Company to conduct strata-title sales of The Four Seasons Apartments and to give favorable concessions with respect to labor quotas and table limits for its resorts by threatening to withhold Sands business; (iii) conduct secret investigations of senior Macau government officials in order to uncover information that it could use to "thwart government regulations/initiatives … adverse to LVSC's interests"; (iv) retain the services of Leonel Alves ("Alves") (a local Macau attorney and member of Macau's Legislative Assembly and the Macau Executive Council), despite potential FCPA issues arising from his employment, and negotiations thereof; and (v) refrain from disclosing material information to SCL's Board including the Company's involvement with the junket[2] business led by Chinese organized crime.  When confronted by Jacobs' resistance to acquiesce to his imprudent and unlawful demands, defendant Adelson responded that "he was Chairman of the Board and the controlling shareholder of [SCL] and would 'do as [he] please.'"  After Jacobs' abrupt dismissal, SCL hired Alves as its Legal Advisor despite the apparent FCPA issues arising from his position in the Macau government.  Defendant Adelson's "repeated and outrageous" demands and Jacobs' firing when he refused to submit to defendant Adelson's unlawful directives were merely examples of defendant Adelson's utter disregard for the applicable laws and unabridged control over the Board and the Company's operations.

15.    In addition, the other Individual Defendants (as defined herein) were complicit in the illicit scheme to use "improper leverage" and utilize any means whatsoever to obtain favorable

---

[1] Strata-title ownership involves dividing a building's ownership to different parties, or a system of ownership of space (e.g., apartments, rooms, etc.) in multi-story buildings.

[2] A junket is a group of individuals with a "propensity to gamble," and formed for the purpose of gambling, led by a junket operator who directs the junket to certain casinos and are afforded certain benefits and complements courtesy of the junket operator.  In exchange, the junket operator ordinarily receives a cut of the junket gamblers' turnover from the casino.

1    business results for the Company.  The Individual Defendants failed to implement and/or maintain

2    adequate internal controls to prevent violations of the FCPA and state gaming regulations.  Rather

3    than providing oversight over defendant Adelson's operation of the Company, the members of the

4    Board allowed the Chairman unfettered control over the affairs of Sands and its subsidiaries.  The

5    Company's negotiation and execution of a facially improper agreement with a known government

6    official while government concessions were pending is a prime example of the Individual

7    Defendants' failure to maintain proper internal controls is.  Notwithstanding potential violations of

8    the FCPA apparent in Alves' eventual hiring, which were even acknowledged by the Company's

9    President and Chief Operating Officer ("COO") Michael A. Leven ("Leven"), the Individual

10   Defendants acquiesced to the whims of defendant Adelson and simply rubberstamped Alves'

11   employment as Sands' Legal Advisor.  Further, the Individual Defendants knowingly or recklessly

12   allowed the Company to associate with notorious Chinese organized crime figures through its junket

13   business in direct contravention of the Nevada gaming regulations.  The Individual Defendants

14   failure to implement and maintain sufficient internal controls to prevent the Company from forging

15   ties with "unsuitable" organizations such as the Triads has jeopardized Sands' operations in Nevada.

16         16.    Defendants' unabashed attempt to improperly manipulate and induce the Macau

17   government's cooperation with the Company's business agenda was revealed to the public for the

18   first time when Jacobs filed a complaint (the "Jacobs Complaint") in Nevada disputing the terms of

19   his dismissal and exposing defendants' series of FCPA violations and breaches of applicable state

20   laws.  In his complaint, Jacobs alleged that he was dismissed from his post as CEO of SCL for

21   objecting to defendant Adelson's demands to engage in conduct that would have violated the FCPA

22   and state gaming regulations.

23         17.    It was not until early 2011 that shareholders began to learn of the magnitude and

24   severity of Sands' FCPA problems.  However, the Individual Defendants should have had concerns

25   over potential violations much earlier.  On March 1, 2011, Sands disclosed that it received a

subpoena from the SEC on February 9, 2011, requesting documents relating to its compliance with the FCPA. Specifically, the Company stated:

18.     Sands received a subpoena from the SEC requesting that the Company produce documents relating to its compliance with the FCPA. The Company has also been advised by the Department of Justice that it is conducting a similar investigation. Any determination that we have violated the FCPA could have a material adverse effect on our financial condition.

19.     Further, the Company was informed that the DOJ was conducting a similar investigation. In its filing, defendant Adelson acknowledged that he believed the government investigations "emanated" from allegations made in the Jacobs Complaint. The Company faces serious damages, including fines, penalties, and adverse changes to its business practices and compliance programs as a result of the SEC and DOJ investigations. As the Individual Defendants admitted, "[a]ny determination that [the Company has] violated the FCPA could have a material adverse effect on [its] financial condition."

20.     The SEC and the DOJ are not the only agencies scrutinizing the Company's business operations in Macau. The Nevada Gaming Control Board ("NGCB") and the Federal Bureau of Investigation ("FBI") have initiated investigations into the matters addressed in the Jacobs Complaint, including the Company's ties to the Triads, which would potentially run afoul of Nevada gaming regulations.

21.     In addition, in October 2011, Sands' General Counsel, Gayle Hyman, circulated an internal memo seeking to secure a list of government officials who have gambled at the Company's Macau casinos, indicating a focus of the U.S. government's bribery probe into the Company. The memo, which closely matches a subpoena sent by the SEC, instructs Sands employees to retain documents regarding "transmission of anything of value" to current and former Macau government officials and their family members. The memo also names several Sands employees and contractors about whom documents must be preserved, including Alves. The memo seeks the names of passengers who flew in and out of Macau on the Company's private planes. Employees must retain

"all documents identifying government officials who have gambled in [Sands] casinos located in Macau," including video surveillance of them.

22.    As a result of the Individual Defendants' breaches of fiduciary duty, the Company now faces significant liability for violations of the FCPA and state regulations.  The FCPA grants federal authorities the power to impose a broad range of civil and criminal sanctions.  Thus, it is likely Sands will be subject to future sanctions and fines, and may expend a great deal more resources and monies to address any adverse findings against it.   A violation of the Nevada gaming regulations may cost the Sands its gaming license, essentially the lifeblood of the Company's operations in Nevada.  In addition, the Company is mired in a multi-million dollar lawsuit instituted by its former executive alleging breach of contract.  Finally, the Company has not disclosed how much its internal review and cooperation with regulators have cost thus far.  However, given the egregious nature of the charges, the Company's purported intent to cooperate with the SEC and DOJ investigations, and the additional probe initiated by the NGCB and FBI, it is likely that the ultimate cost to the Company will run in the hundreds of millions of dollars.  Plaintiffs, on behalf of Sands, seek to recover for Sands the damages caused to the Company by the Individual Defendants.

**III.      THE PARTIES**

23.    Plaintiff Nasser Moradi was a shareholder of Sands at the time of the continuing wrong complained of and remains a shareholder.  Plaintiff owns approximately 11,145 Sands shares and has continuously been a shareholder since December 27, 2004.  Plaintiff is a citizen of Maryland.

24.    Plaintiff Richard Buckman was a shareholder of Sands at the time of the continuing wrong complained of and remains a shareholder.  Plaintiff owns approximately 1,000 Sands shares and has continuously been a shareholder since August 13, 2009.  Plaintiff is a citizen of Florida.

25.    Plaintiff Douglas Tomlinson was a shareholder of Sands at the time of the continuing wrong complained of and remains a shareholder.  Plaintiff owns approximately 500 Sands shares and has continuously been a shareholder since May 28, 2009.  Plaintiff is a citizen of Kansas.

26.     Plaintiff Matt Abbeduto was a shareholder of Sands at the time of the continuing wrong complained of and remains a shareholder.  Plaintiff owns approximately 200 Sands shares and has continuously been a shareholder since April 6, 2009.  Plaintiff is a citizen of Illinois.

27.     Plaintiff Louisiana Municipal Police Employees' Retirement System was a shareholder of Sands at the time of the continuing wrong complained of and remains a shareholder. Plaintiff is a citizen of Louisiana.

28.     Plaintiff Stephen Hardy was a shareholder of Sands at the time of the continuing wrong complained of and remains a shareholder.  Plaintiff is a citizen of Arizona.

29.     Nominal party Sands is a multi-use, resort development and gaming company with its operating headquarters located at 3355 Las Vegas Boulevard South, Las Vegas, Nevada.  Sands does hundreds of millions of dollars of business in the United States in general, and Nevada in particular, each year.  Sands' stock is listed and traded on the New York Stock Exchange.  A majority of Sands' outstanding shares are owned by United States shareholders.  Indeed, the majority of Sands' top ten largest shareholders are all United States citizens or organized under the laws of a state that is a part of the United States.

30.     Defendant Sheldon Gary Adelson ("Adelson") has been Chairman of the Board and Chief Executive Officer of Sands since August 2004.  Adelson also serves as the Chairman of the Board of Directors of the Company's subsidiary, SCL.  Adelson is a member of the Nominating and Governance Committee and has been since at least April 2008.  Adelson purposefully directed the Company to violate the FCPA or the FCPA's underlying directives regarding books, records and internal accounting, and state gaming regulations by encouraging Sands employees to improperly induce senior Macau governmental officials and aggressively grow the Company's junket business in order to obtain favorable business results for the Company.  Defendant Adelson failed to implement and maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations.  Adelson also breached his fiduciary duties owed to Sands by failing to direct Sands to initiate suit against the Company's current Board members and officers for causing

1  and/or allowing Sands to engage in activities that are in violation of the FCPA.  Sands paid

2  defendant Adelson the following compensation as an executive and director:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2010 | $1,000,000 | - | $1,825,000 | $5,658,469 | $2,873,397 | $11,356,866 |
| 2009 | $1,000,000 | $24,625 | $1,825,000 | - | $2,725,524 | $5,575,149 |

3        31.   Defendant Michael A. Leven ("Leven") has been the Company's President and Chief

4  Operating Officer since March 2009 and a director of the Company since August 2004.  Leven is

5  also a director of SCL.  Leven was SCL's Acting CEO from July 2010 to July 2011; Special Adviser

6  to SCL's Board from October 2009 to July 2010; and a director of Las Vegas Sands, Inc., the

7  predecessor of Las Vegas Sands, LLC, from May 2004 to July 2005.  Leven knowingly or recklessly

8  allowed Sands to violate the FCPA by authorizing the Company to improperly induce Macau

9  officials to obtain favorable business results for the Company.  Further, defendant Leven failed to

10  implement and/or maintain adequate internal controls with respect to the Company's compliance

11  with the FCPA and applicable state regulations.  Further, Leven breached his fiduciary duties owed

12  to Sands by failing to direct Sands to initiate suit against the Company's current Board members and

13  officers for causing and/or allowing Sands to engage in activities that are in violation of the FCPA.

14  Sands paid defendant Leven the following compensation as an executive and director:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|------|--------|-------|---------------|------------------------|-------|
| 2010 | $2,000,000 | $1,020,000 | $9,120,000 | $130,628 | $12,270,628 |
| 2009 | $1,561,539 | $202,740 | $2,400,000 | $229,454 | $4,393,733 |

15        32.   Defendant Charles D. Forman ("Forman") has been a Director of Sands since August

16  2004.  Forman is also a director of Las Vegas Sands, LLC, a subsidiary of Sands, and has been since

17  March 2004.  Forman breached his fiduciary duties owed to Sands by failing to direct Sands to

18  initiate suit against the Company's current and former Board members and officers for causing

19  and/or allowing Sands to engage in activities that are in violation of the FCPA.  Forman knowingly

20  or recklessly allowed Sands to violate the FCPA by authorizing the Company to improperly induce

21  Macau officials to obtain favorable business results for the Company.  Further, Forman failed to

11

1   implement and/or maintain adequate internal controls with respect to the Company's compliance

2   with the FCPA and applicable state regulations.  Sands paid Forman the following compensation as a

3   director:

| Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|------|------|------|------|------|
| 2010 | $58,500 | $50,000 | $302,000 | $410,500 |
| 2009 | $75,000 | $50,000 | - | $125,000 |

4        33.   Defendant Irwin Chafetz ("Chafetz") has been a Director of Sands since March 2005.

5   Chafetz was also a director of Las Vegas Sands, Inc., the predecessor of Las Vegas Sands, LLC,

6   from March 2005 to July 2005.  Chafetz knowingly or recklessly allowed Sands to violate the FCPA

7   by authorizing the Company to improperly induce Macau officials to obtain favorable business

8   results for the Company.  Further, Chafetz failed to implement and/or maintain adequate internal

9   controls with respect to the Company's compliance with the FCPA and applicable state regulations.

10  Chafetz breached his fiduciary duties owed to Sands by failing to direct Sands to initiate suit against

11  the Company's current and former Board members and officers for causing and/or allowing Sands to

12  engage in activities that are in violation of the FCPA.  Sands paid defendant Chafetz the following

13  compensation as a director:

| Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|------|------|------|------|------|
| 2010 | $54,750 | $50,000 | $302,000 | $406,750 |
| 2009 | $83,776 | $50,000 | - | $133,776 |

14       34.   Defendant George P. Koo ("Koo") has been a Director of Sands since April 2008.

15  Koo knowingly or recklessly allowed Sands to violate the FCPA by authorizing the Company to

16  improperly induce Macau officials to obtain favorable business results for the Company.  Further,

17  Koo failed to implement and/or maintain adequate internal controls with respect to the Company's

18  compliance with the FCPA and applicable state regulations.  Koo breached his fiduciary duties owed

19  to Sands by failing to direct Sands to initiate suit against the Company's current Board members and

20  officers for causing and/or allowing Sands to engage in activities that are in violation of the FCPA.

21  Sands paid defendant Koo the following compensation as a director:

22  / / /

| Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|------|------|------|------|------|
| 2010 | $53,500 | $50,000 | $302,000 | $405,500 |
| 2009 | $66,000 | $50,000 | - | $116,000 |

35.    Defendant Irwin A. Siegel ("Siegel") has been a Director of Sands since February 2005.  Siegel is also a director of SCL and has been since October 2009.  Siegel was a director of Las Vegas Sands, Inc., the predecessor of Las Vegas Sands, LLC, from February 2005 to July 2005.  Siegel is also Chairman of Sands' Audit Committee and has been since at least April 2008.  Defendant Siegel knowingly or recklessly allowed Sands to violate the FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable business results for the Company, and failed to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations.  Further in violation of his Audit Committee duties, Siegel knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements.  Siegel also breached his fiduciary duties owed to Sands by failing to direct Sands to initiate suit against the Company's current Board members and officers for causing and/or allowing Sands to engage in activities that are in violation of the FCPA.  Sands paid Siegel the following compensation as a director:

| Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|------|------|------|------|------|
| 2010 | $76,250 | $50,000 | $302,000 | $428,250 |
| 2009 | $106,526 | $50,000 | - | $156,526 |

36.    Defendant Jeffrey H. Schwartz ("Schwartz") has been a Director of Sands since March 2009.  Schwartz is also a director of SCL and has been since October 2009.  Schwartz is a member of Sands' Audit Committee and has been since March 2009.  Schwartz knowingly or recklessly allowed Sands to violate the FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable business results for the Company, and failed to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations.  Further in violation of his Audit Committee duties, defendant Schwartz knowingly or recklessly failed to oversee the Company's compliance with applicable legal and regulatory requirements.  Schwartz breached his fiduciary duties by failing to require Sands to

13

1   implement internal controls in compliance with the FCPA or the FCPA's underlying directives

2   regarding books, records and internal accounting, which are designed to ferret out and ultimately

3   prevent just the type of bribery and kickbacks that have occurred at Sands.  Schwartz also breached

4   his fiduciary duties owed to Sands by failing to direct Sands to initiate suit against the Company's

5   current and former Board members and officers for causing and/or allowing Sands to engage in

6   activities that are in violation of the FCPA.  Sands paid defendant Schwartz the following

7   compensation as a director:

| Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|------|------|------|------|------|
| 2010 | $53,250 | $50,000 | $302,000 | $405,250 |
| 2009 | $54,389 | $50,000 | $100,000 | $204,389 |

8        37.    Defendant Jason N. Ader ("Ader") has been a Director of Sands since April 2009.

9   Ader is also a member of Sands' Audit Committee and Nominating and Governance Committee and

10   has been since April 2009.  Ader breached his fiduciary duties by failing to require Sands to

11   implement internal controls in compliance with the FCPA or the FCPA's underlying directives

12   regarding books, records and internal accounting, which are designed to ferret out and ultimately

13   prevent just the type of bribery and kickbacks that have occurred at Sands.  Ader knowingly or

14   recklessly allowed Sands to violate the FCPA by authorizing the Company to improperly induce

15   Macau officials to obtain favorable business results for the Company, and failed to implement and/or

16   maintain adequate internal controls with respect to the Company's compliance with the FCPA and

17   applicable state regulations.  Further in violation of his audit committee duties, defendant Ader

18   knowingly or recklessly failed to oversee the Company's compliance with applicable legal and

19   regulatory requirements. Ader also breached his fiduciary duties owed to Sands by failing to direct

20   Sands to initiate suit against the Company's current and former Board members and officers for

21   causing and/or allowing Sands to engage in activities that are in violation of the FCPA.  Sands paid

22   defendant Ader the following compensation as a director:

| Year | Fees Paid In Cash | Stock Awards | Option Awards | Total |
|------|------|------|------|------|
| 2010 | $55,250 | $50,000 | $302,000 | $407,250 |
| 2009 | $50,517 | $50,000 | $100,000 | $200,517 |

38.     Defendant Wing T. Chao ("Chao") was a Sands director from July 2010 to November 2010.  In November 2010, defendant Chao entered into a consulting agreement with Sands, pursuant to which he will advise the Company on its design and development projects. Defendant Chao knowingly or recklessly allowed Sands to violate the FCPA by authorizing the Company to improperly induce Macau officials to obtain favorable business results for the Company.  Further, defendant Chao failed to implement and/or maintain adequate internal controls with respect to the Company's compliance with the FCPA and applicable state regulations.

39.     The defendants identified in ¶¶35-37 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶30-38 are referred to herein as the "Individual Defendants."

## IV.     THE FIDUCIARY DUTIES OF SANDS' DIRECTORS AND OFFICERS

40.     As directors, officers, and fiduciaries of Sands and because of their ability to control the business and corporate affairs of Sands, the Individual Defendants owed fiduciary duties of trust, due care, candor, good faith and loyalty to the Company and its shareholders.  These Individual Defendants were required to use their utmost ability to control and manage Sands in a fair, just, honest, and equitable manner.  They are prohibited from engaging in self-dealing as well as unlawful corporate conduct, such as violations of the laws, rules and regulations applicable to Sands and its business, including the FCPA, specifically its books and records provisions.

**Code of Business Conduct**

41.     Starting in 2005, the Company adopted its Code of Business Conduct and Ethics (the "Code").  The Code is applicable to the Company's "directors, officers, including the principal executive officer, principal financial officers, principal accounting officer, employees, and agents," collectively referenced as Covered Persons.  According to the Code, its purpose is to "maintain high business ethics and standards."  In particular, the Code mandates that all Covered Persons comply with "both the letter and spirit of all laws, rules, and regulations applicable to the Company's business."  Specifically, the Code directs all Covered Persons to "comply strictly with the [FCPA]."

Under the Code, Covered Persons must follow "Company procedures for carrying out and reporting business transactions" in compliance with the internal accounting control and record-keeping requirements of the FCPA. Finally, the Code requires that "[e]ach Covered Persons, wherever located, is responsible for conducting his or her business activities in compliance with the Code and the laws of the foreign country in which he or she works."

**Specific Audit Committee Duties**

42.     In addition to their general duties, defendants Ader, Schwartz, and Siegel owe and owed specific duties as members of the Audit Committee, under the Audit Committee's Charter, to Sands. In particular, under the Audit Committee Charter in effect since April 2006, and amended in April 2008, these Audit Committee Defendants were responsible for overseeing the Company's compliance with legal and regulatory requirements. The Audit Committee Defendants were also required to review "the adequacy of the Company's internal controls and its procedures designed to ensure compliance with laws and regulations and any special audit steps adopted in light of material control deficiencies." Finally, the Audit Committee Defendants were tasked with the general duty to "review with management and the independent registered public accounting firm any reports or disclosures submitted by management to the Audit Committee, … including management's assessment of the effectiveness of the Company's internal control over financial reporting[.]" The Audit Committee met eight times during 2008, and five times during 2009.

**Control, Access, and Authority**

43.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Sands, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

44.     Because of their advisory, executive, managerial, and directorial positions with Sands, each of the Individual Defendants had access to adverse, non-public information about the financial condition and operations of Sands.

16

45.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sands, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

46.     To discharge their duties, the officers and directors of Sands were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Sands were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business legally possible;

(c)     remain informed as to how Sands conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices; and

(d)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Breach of Duties**

47.     Each Individual Defendant, by virtue of his position as a officer and/or director, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Sands, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the

1  Individual Defendants who were also officers and/or directors of the Company has been ratified by

2  the remaining Individual Defendants who collectively comprised all of Sands' Board.

3       48.     The Individual Defendants breached their duties of loyalty and good faith by

4  operating Sands without implementing and maintaining internal controls in compliance with the

5  FCPA and applicable state regulations. These improper inducements and underhanded practices

6  with the aim to influence foreign officials were facilitated by the Individual Defendants conducting

7  Sands' business in countries with a higher risk of corruption, like Macau, without establishing a

8  system of internal controls to ensure compliance with the FCPA and applicable state regulations. As

9  a result, Sands has expended, and will continue to expend, significant sums of its capital, both

10  reputational and economic, addressing the misconduct alleged herein.

11  **V.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

12       49.     In committing the wrongful acts alleged herein, the Individual Defendants have

13  pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

14  conspired with one another in furtherance of their common plan or design. In addition to the

15  wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further

16  aided and abetted and/or assisted each other in breaching their respective duties.

17       50.     During all times relevant hereto, the Individual Defendants, collectively and

18  individually, initiated a course of conduct that was designed to and did: (i) conceal the fact that the

19  Individual Defendants caused the Company to systematically violate applicable federal and state

20  laws; (ii) deceive the investing public, including shareholders of Sands, regarding the Individual

21  Defendants' management of Sands' operations; and (iii) enhance the Individual Defendants'

22  executive and directorial positions at Sands and the profits, power, and prestige that the Individual

23  Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy,

24  and course of conduct, the Individual Defendants collectively and individually took the actions set

25  forth herein.

51.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to violate the FCPA and state gaming regulations.

52.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

53.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly violate applicable federal and state laws.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## VI.     SUBSTANTIVE ALLEGATIONS

55.     Sands is a multinational multi-use resort development and gaming company.  Sands' business is global in scope and it has a market presence in Asia, including Macau and Singapore.  According to company security filings, earnings from Macau provide over two-thirds of Sands' worldwide revenue.  In particular, Sands, through its majority-owned subsidiary SCL, owns and operates several properties in Macau, including Sands Macao, The Venetian Macao, and The Four Seasons Macao.  SCL spun-off of Sands in November 2009, through a $2.5 billion initial public offering on the Hong Kong Stock Exchange.  As of December 31, 2010, Sands owns 70.3% of the issued and outstanding ordinary shares of SCL.  Among other properties in Macau, SCL directly owns The Venetian Macao, the Sands Macao, and the Plaza Macao.

56.    The Four Seasons Macao first opened in August 2008, currently consists of The Four Seasons Hotel Macao.  However, according to the Company, The Four Seasons Macao will soon feature The Four Seasons Apartments Macao, Cotai Strip, which consists of The Four Seasons serviced and branded luxury apartments.  In all, ***Sands' Macau operations account for approximately 61.5% of the Company's total net revenue, or $4.2 billion***.  Sands' (as well as other companies') business operations in Macau are perceived as presenting a higher than normal risk of corruption, where, for example, improper payments in exchange for gaming concessions are not discouraged.

**FCPA Requirements and Nevada Gaming Regulations**

57.    Sands' stock is traded on the New York Stock Exchange under the symbol "LVS."  As an issuer under the U.S. federal securities laws, Sands' business and operations are also subject to the requirements of the FCPA.

58.    The FCPA, first enacted in 1977, made it unlawful for U.S. issuers of registered securities (i.e., corporations), or any person acting at their behest, to make improper payments to any foreign official in order to obtain or retain business. 15 U.S.C. §78dd-l.  In addition, the FCPA established accounting control requirements for issuers subject to either the registration or reporting provisions of the Securities Exchange Act of 1934 (the "Exchange Act"). 15 U.S.C. §78m.  In particular, the FCPA requires every issuer with a class of securities registered pursuant to Section12 of the Exchange Act to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer.

59.    The FCPA also requires covered companies to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") or any other criteria applicable to such statements, and to maintain accountability for assets.

60.     In addition, because Sands is incorporated and headquartered in Nevada, it must comply with the gaming laws of the state, which prohibit "unsuitable" associations that "reflect or tend to reflect discredit [or disrepute] upon the State of Nevada or the gaming industry."  In particular, the Nevada gaming regulations are as follows, in pertinent part:

> **5.011 Grounds for disciplinary action.** The board and the commission deem any activity on the part of any licensee, his agents or employees, that is inimical to the public health, safety, morals, good order and general welfare of the people of the State of Nevada, *or that would reflect or tend to reflect discredit upon the State of Nevada or the gaming industry*, to be an unsuitable method of operation and shall be grounds for disciplinary action by the board and the commission in accordance with the Nevada Gaming Control Act and the regulations of the board and the commission. Without limiting the generality of the foregoing, the following acts or omissions may be determined to be unsuitable methods of operation …

> 10. Failure to conduct gaming operations in accordance with proper standards of custom, decorum and decency, or permit any type of conduct in the gaming establishment *which reflects or tends to reflect on the repute of the State of Nevada and act as a detriment to the gaming industry*.

61.     Since Macau's return to Chinese rule in December 1999, its immensely profitable gambling industry has opened its doors to domestic and foreign entities seeking to develop casino resorts.  In fact, in 2006, gambling revenue in Macau surpassed that of Las Vegas, and in 2010, Macau's gaming revenue quadrupled that of Las Vegas.  However, Macau has been plagued by political corruption and the influence of organized crime.  For example, in January 2008, Ao Man Long, Macau's Secretary for Transport and Public Works, was convicted of taking more than $100 million in bribes, laundering money, and abusing his power to help property developers win lucrative government construction deals and contracts linked to casino construction.

62.     Further, Macau casinos, including Sands, have been linked to Chinese organized crime that has used casino property to run their loan-sharking, junket, and prostitution operations.

63.     On March 29, 2010, Reuters published an article about a murder-for-hire plot involving Cheung Chi-tai ("Cheung"), a leader of the Triads and detailing Sands' ties to Cheung and the Triads:

> The murder-for-hire case sheds light on the links between China's secretive triad
> societies and Macau's booming gambling industry. It also raises potentially troubling
> questions about one of the world's largest gaming companies, Las Vegas Sands,
> which plans to open a $5.5 billion Singapore casino resort in late April.
>
> Cheung was not just named as a triad member but also, according to a regular casino
> patron testifying in the trial, **"the person in charge" of one of the VIP rooms at the
> Sands Macau**, the first of three casinos run here by Las Vegas Sands. In addition,
> Cheung has been a major investor in the Neptune Group, a publicly traded company
> involved in casino junkets -- the middlemen who bring wealthy clients to Macau's
> gambling halls. Documents show that his investment allowed him a share in the
> profits from a VIP gambling room at the casino.
>
> An examination of Hong Kong court records, U.S. depositions from the former
> president of Sands, and interviews with law enforcement and security officials in
> both the U.S. and Macau, reveals **a connection between Las Vegas Sands and
> Cheung** -- ties that could potentially put Sands in violation of Nevada gaming laws.

An unidentified gaming official in the Reuters article made the following statement: "This relationship (with Cheung) would be of concern to Nevada authorities. You're talking about direct ties to bad guys."

64.    Indeed, it is well-known that Macau is a hotbed for money laundering and that it caters to China's triads, which keeps many American gaming companies from establishing facilities there.  A 2011 International Narcotics Control Strategy Report by the U.S. State Department noted that Macao is "vulnerable to becoming a hub for the laundering of criminal proceeds."

65.    In 2002, Sands, in a joint venture with a Hong Kong based corporation, Galaxy Entertainment Group ("Galaxy"), was awarded gambling concessions by the Macau government, becoming the first American operator to open a casino on Chinese soil.  Sands' victory however, was marred by allegations of corruption and violations of the FCPA.  In fact, soon after winning the concession bidding, three separate civil suits were filed against the Company alleging that the Company had failed to pay the plaintiffs' contracted fees for brokering the joint venture between Sands and Galaxy, which assisted the Company in winning the Macau gambling concessions. Evidence from the litigations revealed potential improprieties in the nature of the bidding process for the gambling concessions.   To start, testimony by the Company's former President and COO,

1    Weidner, revealed that the joint venture was actually orchestrated by the Macau government merely

2    days before the gambling concessions were awarded in order "to put a Chinese face on [the] license."

3    Moreover, when the joint venture proved unsustainable due to irreconcilable differences between

4    Sands and Galaxy after the concessions had already been awarded, in an unprecedented move,

5    Macau officials changed its gambling policy to allow Sands to open its own casino resort

6    independent of Galaxy.   Due to the questions surrounding potential improprieties concerning the

7    Macau government's awarding of the gambling concessions to the Company, Sands was concerned

8    that the pending litigations would reveal violations of the FCPA during the bidding process.   In fact,

9    Sands retained outside legal counsel specializing in FCPA issues to prepare a defense in case the

10   SEC or DOJ were to investigate the 2002 concession bidding.   Ultimately, Sands was not

11   investigated for misconduct at that time, and the foregoing civil litigation was settled prior to trial in

12   2009.   Sands has since opened three casino resorts in Macau through SCL and is currently

13   developing luxury apartments serviced and branded by The Four Seasons – The Four Seasons

14   Apartments.

15          66.      The Company's ability to sell The Four Seasons Apartments as condos has been a

16   point of heavy contention between Sands and the Macau government.   This is because the

17   Company's concession to the property where The Four Seasons Apartment is currently being

18   developed, the Cotai Strip site, is restricted solely for gaming and hospitality projects.   As such,

19   strata-title sales of The Four Seasons Apartments are prohibited under the land lease agreement.

20   Sands has lobbied the Macau government to authorize strata-title sales of its apartments on the Cotai

21   Strip site.   The Macau government has yet to authorize strata-title sales of The Four Seasons

22   Apartments, however, an application by the Company to sell The Four Seasons Apartments as co-

23   ops[3] is currently pending.   The co-op scheme would not violate the land lease agreement because,

---

[3] Under a co-op, or a cooperative form of ownership scheme, an entity commonly referred to as the housing cooperative (e.g., a corporation) owns the building, and each shareholder is granted the right

1    unlike strata-title ownership, the Company would not have to cede title of the property to a third-

2    party entity.  On December 20, 2010, SCL announced that it had received a letter from the Macau

3    Land, Public Works and Transport Bureau, indicating that approval for co-op sales of The Four

4    Season Apartments were in "its final proceeding…."

5                    **Defendant Adelson's Dominion and Control Over Sands**

6            67.     Defendant Adelson, as controlling shareholder, CEO, and Chairman, dictates the

7    everyday affairs and operations of Sands.  As of February 18, 2011, defendant Adelson controls

8    approximately 46.2% percent of the voting power of its common stock.  In fact, every Form 10-K

9    filed by the Company since its initial public offering ("IPO") in 2004 explicitly acknowledges

10   defendant Adelson's dominion and control over the operations and affairs of the Company,

11   describing his considerable influence over the make-up of the Board as follows:

12           *The interests of our principal stockholder in our business may be different from*
13           *yours.*

14           Mr. Adelson, his family members and trusts established for the benefit of
15           Mr. Adelson and/or his family members beneficially own (excluding unexercised
16           warrants to purchase 87.5 million shares of our common stock) approximately 49%
17           of our outstanding common stock as of December 31, 2010.  Accordingly,
18           *Mr. Adelson exercises significant influence over our business policies and affairs,*
19           *including the composition of our Board of Directors and any action requiring the*
20           *approval of our stockholders*, including the adoption of amendments to our articles
21           of incorporation and the approval of a merger or sale of substantially all of our assets.
22           *The concentration of ownership may also delay, defer or even prevent a change in*
23           *control of our company and may make some transactions more difficult or*
24           *impossible without the support of Mr. Adelson*.  The interests of Mr. Adelson may
25           conflict with your interests

26           68.     The Board has continuously and unwaveringly submitted to the wishes of defendant

27   Adelson and extended defendant Adelson and his family members every privilege at the expense of

_____

to occupy a housing unit in the building.  The shareholder does not own the real estate, but rather
owns a share of the legal entity that owns the real estate.

the Company.  For instance, the Company and its predecessor entities have employed defendant Adelson's wife, Dr. Miriam Adelson ("Dr. Adelson"), as Director of Community Involvement since August 1990 and paid her a salary of $50,405 and $50,000, in 2008 and 2009, respectively.  In addition, defendant Adelson's stepdaughter has been employed by the Company as his Special Assistant since at least 2007, during which time she received salaries of $98,100, $103,000, and $85,500, in 2007, 2008, and 2009, respectively.

69.     The Company has also afforded defendant Adelson and his family members security and transportation at considerable expense to Sands.  The Company incurred a cost of approximately $2.5 million to provide security for defendant Adelson and his immediate family.  Further, the Company paid $128,774, $173,291, and $163,812, in 2007, 2008, and 2009, respectively, for an automobile and driver for defendant Adelson.  From at least 2007 to 2009, Sands reimbursed defendant Adelson $100,000 in unidentified "professional fees."

70.     Sands has also engaged in lucrative transactions with entities owned and/or operated by defendant Adelson and his family members.  For instance, the Company purchased certain products from defendant Adelson's brother's Company, Deluxe Hotels Supply, LLC, at a cost to the Company of $1.8 million, $1.2 million, and $1.0 million, in 2005, 2006, and 2007, respectively.  In addition, Sands entered into several aircraft time-sharing agreements with Interface Operations, LLC ("Interface Operations"), a Company controlled by defendant Adelson, for use of certain aircrafts owned by the entity.  Pursuant to the time-sharing agreements, the Company paid Interface Operations $5.8 million in 2008 and $7.3 million in 2009.

71.     Recently, Dr. Adelson has made significant investments in the Company, and accordingly received substantial interest payments and dividends from her holdings.  In September 2008, the Company sold $475 million in aggregate principal amount of its 6.5% convertible senior notes due 2013 in a private transaction to Dr. Adelson.  Thereafter, on November 14, 2008, Dr. Adelson converted the $475 million aggregate principal amount of the convertible notes into shares of common stock at a conversion price of $5.50 per share.  The Company made an early interest

payment in the amount of approximately $3.7 million on the convertible notes to Dr. Adelson. On November 14, 2008, Dr. Adelson also purchased 5,250,000 shares of the Company's 10% Series A Cumulative Perpetual Preferred Stock and warrants to purchase an aggregate of up to 87,500,175 shares of common stock at an exercise price of $6.00 per share. In 2009, the Company paid Dr. Adelson quarterly dividend payments on the preferred stock in the aggregate amount of $52.5 million. Finally, the Company covered Dr. Adelson's legal fees in the aggregate amount of approximately $499,650, "in connection with the convertible notes and the preferred stock and warrant transactions."

72.    Aside from the slew of perquisites afforded defendant Adelson and his family members, defendant Adelson is and has been a member of the Nominating and Governance Committee since at least 2008, and, thus, determined who served on the Board and what their remuneration would be. In turn, defendant Adelson has used his unbound influence and power over the Board, filled with his hand-picked stooges, to impose his will on the Company and engage it in a course of conduct that has exposed the Company to potential fines and sanctions arising from violations of the FCPA.

73.    There is no better example of defendant Adelson's influence over the rest of the Individual Defendants than the acrimonious "resignation" of former Sands President and COO, Weidner. Beginning in or about 2008, Sands felt the impact of the deteriorating global economy, as shares fell tremendously from an all-time high of $148.76 on October 29, 2007, to $1.42 on March 9, 2009. Among other disagreements, defendant Adelson and Weidner had engaged in a series of disputes concerning when to raise additional capital in order to avoid breaching the maximum leverage ratios set by Sands' bank creditors. Defendant Adelson's stubborn insistence on delaying accessing the capital markets, against the advice of Weidner, forced the Company to resort to several last-minute transactions to avoid bankruptcy, including a $1 billion influx of cash from defendant Adelson, a follow-on offering of the Company's common stock, and halting construction on new developments in Las Vegas, Pennsylvania, and Macau.

74.    Defendant Adelson's constant strife with senior management caused the Company to appoint a special Executive Committee comprised of defendants Leven, Chafetz, and Siegel to mediate disputes between defendant Adelson and senior management, including Weidner.  Among the reasons for appointing the Executive Committee, the Company cited senior management's "loss of confidence … in the management of the Company and [its] governance process."  The Company described the role and reasons for the appointment of the Executive Committee as follows in its Form 10-Q filed November 10, 2008:

> On October 29, 2008, certain members of our management team, including Sheldon G. Adelson, Chairman of the Board and Chief Executive Officer, William P. Weidner, President and Chief Operating Officer, Bradley H. Stone, Executive Vice President, and Robert G. Goldstein, Senior Vice President (the "Senior Management Members"), recommended to our board of directors that it institute additional corporate policies and procedures. Upon such recommendation, our board of directors formed an executive committee (the "Executive Committee") comprised of Irwin Chafetz, Michael A. Leven and Irwin A. Siegel, with Mr. Leven being the Chairman of the Executive Committee. The role of the Executive Committee is to exercise the powers of the board of directors in between scheduled board meetings, including the power to resolve disagreements among management. Also, the board of directors gave Mr. Stone the additional responsibilities of President of Construction and Operations. ***The board of directors adopted these measures to address governance concerns raised by the Senior Management Members, address a number of outstanding differences between our Chief Executive Officer and other Senior Management Members and in response to a loss of confidence by certain Senior Management Members in the management of the Company and our governance process.***

75.    The underlying purpose behind the creation of the Executive Committees became all too apparent as merely five months after its creation, the committee was dissolved following the ouster of defendant Adelson's nemesis, Weidner.  In fact, as detailed below, defendant Leven, who was charged with mediating disputes between Weidner and defendant Adelson as the Chairman of the Executive Committee, curiously replaced Weidner after his forced resignation.

76.    On March 8, 2009, after a bitter internal struggle with defendant Adelson over the operations of the Company, Weidner submitted his resignation from the Company.  In his resignation letter, Weidner acknowledged that he "has had, and continued to have, outstanding

differences with the Chairman and [CEO] [referring to defendant Adelson] about the management of the Company."  Weidner's resignation came ***merely four days*** after two Board members met with him to inform him that the Company had decided to hire defendant Leven, a Sands Board member and defendant Adelson's crony, in his place.  However, as detailed below, the other Board members were not consulted regarding Weidner's dismissal from his position in advance of this meeting with Weidner.

77.    The next day, James Purcell ("Purcell"), a longtime Sands Board member, submitted his resignation to the Company, citing his disagreement with the Board's process leading up to the termination of Weidner.  In his letter, Purcell specifically referenced the Company's failure to inform and consult with the rest of the Board members concerning Weidner's dismissal prior to meeting with Weidner to seek and negotiate his resignation.  Notably, Purcell stated, "[i]t, was in my judgment, wrong to engage in discussions with Weidner to request his resignation without a full and open discussion of the potential consequences of the series of actions that were planned.  No business enterprise should undertake the significant actions that have been and are proposed to be ***taken today without a full meeting of its Board***."  Responding to Weidner's "resignation," defendant Adelson claimed that Weidner's departure was not a loss for the Company, but "[j]ust the opposite." Defendant Adelson also noted that he has" always been in charge" of the Company and the Board. Defendant Adelson quieted any doubt as to his role in Weidner's departure when he remarked, concerning the circumstances of Weidner's departure, that "[w]e just sort of helped [Weidner] out a little bit … [w]e helped him resign a little bit."

78.    As President and COO of Sands, one of defendant Leven's first decisions was to hire Jacobs to head the Company's Macau operations, and later serve as CEO of its spin-off, SCL. Jacobs later dismissal for the same reasons underlying Weidner's departure (disagreements with defendant Adelson) shed light on the Company's pervasive and systemic violations of the FCPA and the Nevada gaming regulations.

**Sands' Violations of the FCPA and Nevada Gaming Regulations**

79.  Sands' violations of applicable federal and state laws were first revealed on October 20, 2010, in a lawsuit filed by Jacobs against the Company, SCL, and unnamed defendants for breach of contract concerning his purported termination "for cause" on July 23, 2010.  The Jacobs Complaint detailed multiple violations of the FCPA committed by the Company under the direction and at the behest of defendant Adelson.  In particular, Jacobs claimed that defendant Adelson instructed him to: (i) use "improper leverage" against senior Macau governmental officials in order to obtain and sell strata-title of The Four Season Apartments in Macau; (ii) threaten to withhold business from Chinese banks unless they pressured senior Macau governmental officials to deliver strata-title for The Four Seasons Apartments to Sands, and give the Company "favorable treatment with regards to labor quotas and table limits"; (iii) conduct discrete investigation of senior Macau governmental officials in order to discover adverse information it could later use to influence the same officials for the benefit of Sands; (iv) hire Alves, who was a local Macau attorney and also a Macau government official, as SCL's Legal Advisor notwithstanding apparent violations of the FCPA arising from Alves' position in the Macau government; and (v) refrain from disclosing material information to SCL's Board including the Company's involvement with the junket business led by the Triads.  Further, the Jacobs Complaint alleged that defendant Adelson sought to "aggressively grow the junket business within Macau" notwithstanding Jacobs' reservations about the junket business which were attributed to, among other things, "investigations by Reuters and other alleging Sands involvement with Chinese organized groups, known as Triads, connected to the junket business."

80.  Jacobs' allegation concerning Alves is particularly surprising given Alves' extensive ties to, and various positions held in the Macau government.  As an administrative region of the PRC, Macau has great autonomy over its own affairs, and is run by the Chief Executive of Macau.  The Executive Council serves as the government's top advisory body, assisting the Chief Executive in the administration of Macau's affairs and in policymaking.  The Legislative Assembly is responsible for, among other things, enacting, amending, suspending, and repealing legislation,

1    debating any issue concerning public interest, and debating the policy addresses by the Chief

2    Executive.  Alves is a member of both the Executive Council and the Legislative Assembly, and is

3    also Chairman of the Audit Committee for Macau's monetary authority.

4        81.    In September 2010, nearly two months after Jacobs' dismissal, SCL rehired Alves as

5    its Legal Advisor.  In fact, Alves was previously employed by SCL for an 18-month period which

6    ended acrimoniously for unexplained reasons in February 2010.  Amazingly, in a Macau Daily

7    Times article dated September 19, 2010, defendant Leven confirmed that Alves had been

8    continuously advising SCL throughout the year, and negotiations for Alves to rejoin SCL were

9    ongoing: ***"He was a close advisor of [SCL] throughout the last year and we would be very***

10   ***interested in having him back."***  The impropriety in Alves' involvement and extended negotiation

11   with SCL is further exacerbated by the fact that Sands was actively seeking concessions from the

12   Macau government to sell strata-title ownership of the Four Seasons Apartments in the Cotai Strip

13   during that time.  In the same article detailed above, defendant Leven acknowledged the potential

14   improprieties apparent in Alves' relationship and negotiation with SCL, stating, "[w]hen we deal

15   with an individual that is a Government official – Alves is also a member of the Executive Council,

16   an advising body to the local government – we have to follow the rules of the U.S."

17       82.    In his May 24, 2011 Reply to Sands' Counterclaim (the "Jacobs Reply"), Jacobs

18   further alleges that after publication of a Reuters article uncovering Sands' connection to the Triads

19   (and, in particular, an individual named Cheung Chi Tai ("Cheung")), SCL commissioned a report

20   showing Cheung's connection with Chinese organized crime.  Jacobs alleges that Adelson was aware

21   of the report and that the report was distributed to Sands' senior management.  Jacobs also alleges

22   that he objected to Sands' relationship with Cheung and raised issues "regarding a scheme concocted

23   by Adelson to intimidate and mislead Reuters and its investigative journalists as to the accuracy of

24   the March 29, 2010 article by sending Reuters a demand for retraction which falsely claimed

25   defamation."  In addition, Jacobs alleges that Sands and/or Adelson never severed the relationship

1    with Cheung.  The court denied a motion to dismiss Jacobs' breach of contract claims on or about

2    June 9, 2011.

3         83.    On March 1, 2011, Sands filed with the SEC its annual report on Form 10-K for the

4    period ended December 31, 2010.  In its Form10-K, the Company disclosed that it was under

5    investigation by the SEC and the DOJ for possible violation of the FCPA.  The Company also

6    announced that it believed the investigations were caused by the allegations made in a suit filed by

7    the former CEO of SCL, Jacobs.  The filing stated in pertinent part:

8         On February 9, 2011, LVSC received a subpoena from the Securities and Exchange
9         Commission requesting that the Company produce documents relating to its
10        compliance with the Foreign Corrupt Practices Act.  The Company has also been
11        advised by the Department of Justice that it is conducting a similar investigation. It is
12        the Company's belief that the subpoena may have emanated from allegations
13        contained in the lawsuit filed by Steven C. Jacobs described above. The Company
14        intends to cooperate with the investigations.

15        84.    Sands further disclosed in the Form 10-K that the resolution of the FCPA

16   investigations could have a material, adverse impact on its business.  For example, the Company

17   stated: "[a]ny determination that [the Company has] violated the FCPA could have a material

18   adverse effect on [its] financial condition."  On this news, Sands ' market capitalization fell by over

19   $2.1 billion, or 6.3% in a single day on March 1, 2011.

20        85.    The significance of the Company's business ventures in Macau to its overall revenues,

21   and the fact that the allegations indicate express directives from Sands ' controlling shareholder, top

22   executive, and Chairman to violate FCPA's anti-bribery provisions, serve as further support for the

23   fact that the Individual Defendants failed to implement and/or maintain adequate internal controls to

24   ensure compliance with the FCPA.  Indeed, in fiscal 2010, when the FCPA violations allegedly

25   occurred, Macau operations accounted for approximately 61.5% of Sands ' total net revenue, or $4.2

26   billion.  Consequently, any adverse findings pursuant to the SEC and DOJ investigations regarding

27   its business in Macau would have an enormous impact on the Company's future business prospects.

28        86.    Under the FCPA, federal authorities may impose a broad range of civil and criminal

29   sanctions on issuers of U.S. registered securities.  The DOJ and SEC have entered into agreements

1    with, and have obtained a range of sanctions against, several public corporations. The results of

2    these actions can be dire. For example, in late 2008, Siemens AG paid $800 million to settle charges

3    that it had inadequate internal controls under the FCPA. In early 2009, Halliburton Company paid

4    $559 million to settle charges that it bribed Nigerian officials during the construction of a gas

5    liquefaction facility. And, in early 2010, Daimler AG paid $93.6 million and entered into a deferred

6    prosecution agreement to resolve charges that it conspired to violate the books and records

7    provisions of the FCPA.

8         87.    As for Sands, the Company disclosed that it "intends to cooperate with the [SEC and

9    DOJ] investigations." According to Leven, the investigation may take several years and involve "a

10   voluminous amount of information, [that] go back probably five year at least." In addition to the

11   FCPA allegations in the Jacobs Complaint, the SEC subpoena also involved Sands and SCL's

12   involvement with the Triads, a notorious organized crime syndicate in China.

13        88.    The extent of the scrutiny surrounding Sands is not limited to the SEC and DOJ

14   investigations, but further extends to investigations surrounding Sands ' purported ties to Chinese

15   organized crime. On March 2, 2011, *The Wall Street Journal* reported that the NGCB has opened its

16   own probe of the Company concerning the allegations made in the Jacobs Complaint, including

17   allegations involving the Company's association with the Triads. As a Nevada gaming corporation,

18   Sands is subject to the gaming laws of the state, which prohibit "unsuitable" associations that "reflect

19   or tend to reflect discredit [or disrepute] upon the State of Nevada or the gaming industry." Adverse

20   findings pursuant to NGCB's investigation could lead to fines and sanctions on the Company's Las

21   Vegas operations as well.

22        89.    On March 11, 2011, Reuters published an article entitled "Special Report: Macau

23   Connection," which revealed yet another government agency investigating the Company in

24   connection with the Jacobs allegations, as well as potential ties between Sands and organized crime

25   in China. Among other things, it was reported in the Reuters article that the FBI had initiated an

26   investigation of the Company "prompted by the Jacobs allegations." The FBI investigation adds to

an ever growing list of agencies looking into the Company's violations of the FCPA arising from the Jacobs Complaint including allegations of the Company's ties to the Triads.  According to the Reuters article, the Company had commissioned background reports on two individuals with ties to the Triads, including Cheung, who reportedly was in charge of running the junket rooms at the Sands Macao:

> SANDS: RETURN OR DESTROY DOCUMENTS
> According to the Jacobs suit, Sands has already done its own poking around within Macau's criminal underworld. The casino commissioned background checks on local officials as well as two alleged criminals.
>
> Sands has given at least one report to Nevada, a casino regulatory source said, but it has gone out of its way to stop the reports from reaching the public eye.
>
> Last year, Reuters published a report on a man named Cheung Chi-tai, described in court testimony as the mastermind behind a plot to murder a dealer suspected of cheating.
>
> At trial a witness identified Cheung as a leader of the Wo Hop To -- one of the largest triads in Hong Kong.
>
> **Cheung was also, according to witness testimony, "the person in charge" of a VIP room at the Sands Macao**, and Hong Kong stock exchange filings showed him to be a "substantial shareholder" in a junket company with ties to the cloistered room.
>
> The allegations emerged in a routine trial, barely noted beyond the crime pages of Hong Kong newspapers. Yet the revelations were historic: this was one of the first documented examples of an alleged criminal figure financially linked to a U.S.-based, publicly traded casino.
>
> The article led to an ongoing Nevada investigation. The company then commissioned its own private background report on Cheung, said a person involved in the Sands effort who requested anonymity.
>
> **The company also ordered a report, according to documents in the Jacobs case, on another figure who was identified as a member of a triad** in a 1992 U.S. Senate Subcommittee probe. Charles Heung was described in a Subcommittee chart of organized crime as an officer of the Sun Yee On triad.
>
> In a 2007 public hearing, the former chair of the Nevada Gaming Control Board, Randy Sayre, also said he had seen three public documents identifying Heung as "a high-ranking member of the triads," according to a transcript.
>
> Heung has repeatedly denied any participation in organized crime.

33

The Sands background reports on Cheung and Heung are the subject of a series of letters in the Jacobs case. Documents show the former executive still holds copies of at least one of the reports based on the investigations commissioned by the casino.

Sands' displeasure is reflected in its legal team's demand for the "immediate" return of the internal inquiries.

"All copies," the attorneys insisted, should "be returned to us or destroyed."

As the article details, the junket system ran by the Triads have been incredibly profitable for Macau casinos:

The source of this criminal expansion is ***Macau's unique junket system, which whisks VIPs into casinos, stakes them, and offers legally suspect services to avoid China's strict currency and debt collection laws***. The junket companies -- widely linked to the triads, according to diplomatic cables -- generated an incredible 72 percent of the region's gaming revenues last year.

"Casino operators regret the growing power of 'junket' operators in mainland China that account for most of the Macau casinos' earnings," one U.S. consulate official reported in a cable. "They believe the operators are directly or indirectly involved with organized crime in Macau and the mainland."

The U.S. casinos operating in Macau are bound by Nevada laws that prohibit them from bringing "disrepute" upon the state. But they have immersed themselves in the junkets -- while privately, according to cables, confiding their concerns about the criminality of the industry to diplomats.

Another cable quoted a senior U.S. executive saying the growth of the triads was leading to expanding corruption in China. Provincial officials were providing "sweetheart" land sales, business licenses, and government contracts to junket operators, in exchange for bank deposits or cash sums paid to the officials upon arrival in Macau.

90. Worse, as defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel disclosed in their Form 10-K, they knew that the Company's association with "unsavory and unsuitable" organizations were in direct violation of the Nevada gaming regulations, and subject to revocation of the Company's gaming license:

The ownership and operation of casino gaming facilities in the State of Nevada are subject to the Nevada Gaming Control Act and the regulations promulgated thereunder (collectively, the "Nevada Act") and various local regulations. Our gaming operations are also subject to the licensing and regulatory control of the

34

Nevada Gaming Commission (the "Nevada Commission"), the Nevada Gaming Control Board (the "Nevada Board") and the Clark County Liquor and Gaming Licensing Board (the "CCLGLB" and together with the Nevada Commission and the Nevada Board, the "Nevada Gaming Authorities").

The laws, regulations and supervisory procedures of the Nevada Gaming Authorities are based upon declarations of public policy that are concerned with, among other things:

- the *prevention of unsavory or unsuitable persons from having a direct or indirect involvement with gaming at any time or in any capacity*;

\* \* \*

*The loss of our gaming license or our failure to comply with the extensive regulations that govern our operations in any jurisdiction where we operate could have an adverse effect on our financial condition, results of operations or cash flows.*

Our gaming operations and the ownership of our securities are subject to extensive regulation by the Nevada Commission, the Nevada Board and the CCLGLB. The Nevada Gaming Authorities have broad authority with respect to licensing and registration of our business entities and individuals investing in or otherwise involved with us.

Although we currently are registered with, and LVSLLC and VCR currently hold gaming licenses issued by, *the Nevada Gaming Authorities, these authorities may, among other things, revoke the gaming license of any corporate entity or the registration of a registered corporation or any entity registered as a holding company of a corporate licensee for violations of gaming regulations*.

In addition, the Nevada Gaming Authorities may, under certain conditions, revoke the license or finding of suitability of any officer, director, controlling person, stockholder, noteholder or key employee of a licensed or registered entity. If our gaming licenses were revoked for any reason, the Nevada Gaming Authorities could require the closing of the casinos, which would have a material adverse effect on our business. In addition, compliance costs associated with gaming laws, regulations or licenses are significant. Any change in the laws, regulations or licenses applicable to our business or gaming licenses could require us to make substantial expenditures or could otherwise have a material adverse effect on our financial condition, results of operations or cash flows.

A similar dynamic exists in all jurisdictions where we operate and a regulatory action against one of our operating entities in any gaming jurisdiction could impact our operations in other gaming jurisdictions where we do business. For a more complete description of the gaming regulatory requirements that have an effect on our business, see "Item 1 — Business — Regulation and Licensing."

91.     According to the Reuters article, and as the Individual Defendants admit in Sands' filings, the Company's purported ties to organized crime in Macau may lead to the NGCB revoking or indefinitely suspending the Company's gaming licenses.

92.     In addition, according to an October 20, 2011 article in *The Wall Street Journal*, Sands' General Counsel, Gayle Hyman, circulated an internal memo seeking to secure a list of government officials who have gambled at the Company's Macau casinos, indicating a focus of the U.S. government's bribery probe into the Company.  The memo, which closely matches a subpoena sent by the SEC, instructs Sands employees to retain documents regarding "transmission of anything of value" to current and former Macau government officials and their family members.  The memo also names several Sands employees and contractors about whom documents must be preserved, including Alves.  The memo seeks the names of passengers who flew in and out of Macau on the Company's private planes.  Employees must retain "all documents identifying government officials who have gambled in [Sands] casinos located in Macau," including video surveillance of them.

**VII.     DAMAGES**

93.     As reflected in the Company's over $4.4 billion decline in market capitalization from a share price high on November 8, 2010 to when the Company revealed it was subject to SEC and DOJ investigation on March 1, 2011, Sands has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.  Further, as a direct and proximate result of the Individual Defendants' misconduct, Sands has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from cooperating with SEC, DOJ, NGCB, and FBI investigations, including complying with subpoena requests, and other production of materials;

(b)     costs incurred from any internal review or investigation of violations of federal and state laws;

(c) additional expenses resulting from increased legal fees, including, without limitation, the $25.3 million increase in corporate expenses for the three months ended September 30, 2011 and $16.4 million increase in corporate expenses for the three months ended June 30, 2010;

(d) costs incurred from the compensation and benefits paid to Individual Defendants who breached their fiduciary duties to the Company;

(e) amounts paid to foreign officials in violation of the FCPA;

(f) any potential fines, sanctions, and disciplinary actions taken against the Company as a result of the Company's violations of the FCPA and state gaming regulations; and

(g) the cost of the potential settlements with the SEC, DOJ, NGCB, FBI, and any other regulatory or executive agency.

94. In addition, Sands' business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.

95. Moreover, these actions have irreparably damaged Sands' corporate image and goodwill. For at least the foreseeable future, Sands will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Sands' ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII.      DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

96. Plaintiffs bring this action derivatively in the right and for the benefit of Sands to redress injuries suffered, and to be suffered, by Sands as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants. Sands is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

97. Plaintiffs were shareholders of Sands at the time of the wrongs complained, have continuously been shareholders since that time, and are current Sands shareholders.

98.     Plaintiffs will adequately and fairly represent the interests of Sands in enforcing and prosecuting its rights.

99.     The Board of Sands at the time plaintiffs commenced this case was comprised of the following eight individuals: defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel.  Plaintiffs have not made any demand on the Board because such a demand would have been a futile and useless act, particularly for the reasons stated below.

**Demand Is Excused as to Defendants Adelson, Leven, Chafetz, and Forman (a Majority of the Board) Because They Are Not Disinterested and Independent— a Fact the Board Itself Admits and At Least One Court Has Already Noted**

100.    Sands expressly acknowledged in its 2010 and 2011 Proxy Statements that a majority of the Company's directors (defendants Adelson, Leven, Chafetz, and Forman) are not independent, per the Board's own determination.  Specifically, the Proxy Statements state:

> *The Board has determined that four of the eight members of the Board satisfy the criteria for independence* under applicable rules promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the NYSE corporate governance rules, namely Messrs. Ader, Koo, Schwartz and Siegel. In making its determinations, the Board reviewed all the relevant facts and circumstances, the standards set forth in our Corporate Governance Guidelines, the NYSE rules and other applicable laws and regulations.
>
> *Two of our directors, Messrs. Chafetz and Forman, have business and personal relationships with our controlling stockholder, Mr. Adelson.* Mr. Chafetz was a stockholder, vice president and director of the entity that owned and operated the COMDEX trade show and The Sands Expo and Convention Center, which were created and developed by Mr. Adelson. Mr. Forman was Vice President and General Counsel of this entity. Mr. Chafetz also is a trustee of several trusts for the benefit of Mr. Adelson's family members that beneficially own shares of our Common Stock. For additional information, see "Proxy and Voting Information — How You Can Vote" and "Principal Stockholders" above. These relationships with Mr. Adelson also include making joint investments and other significant financial dealings. *As a result, Messrs. Adelson, Chafetz and Forman may have their financial interests aligned and therefore, the Board does not consider Messrs. Chafetz and Forman to be independent directors.*

101.    This acknowledgment by the Board is itself sufficient to establish that demand on the Sands Board is futile.  Nonetheless, numerous facts support the Board's position that a majority of its members are not disinterested and independent.

102.     Defendant Adelson is Sands' principal stockholder, Chairman, and CEO, and has been since August 2004.  Adelson made $11.4 million and $5.6 million in total compensation in 2010 and 2009, respectively.  As discussed in detail below, Adelson dominates and controls the Sands Board. He is not sufficiently disinterested for purposes of considering a demand.  Further, defendant Adelson directly authorized a campaign to use "improper leverage," and other illicit means of inducement against Macau officials to obtain favorable business results for the Company.  He explicitly directed the Company to pursue its junket business associated with the Triads in contravention of the Nevada gaming regulations.  Indeed, Adelson is named in the Jacobs Complaint as the driving force behind the Company's issues with the FCPA and the Nevada gaming regulations. As the CEO, Chairman, and controlling shareholder of the Company, defendant Adelson had the utmost duty and responsibility to ensure that the Company implement and maintain adequate internal controls to ensure compliance with the FCPA and state gaming regulations.  Instead, in a direct breach and dereliction of his fiduciary duties, defendant Adelson consciously and purposefully engaged in misconduct that has exposed the Company to severe scrutiny by the SEC, DOJ, NGCB, and FBI.  Defendant Adelson faces a substantial likelihood of liability for breaching his fiduciary duty of loyalty and, thus, lacks the requisite disinterestedness for purposes of considering a demand. Further, Adelson had already clearly signaled his hostility toward the allegations in this case.  For example, defendant Adelson has publicly stated to reporters that Jacobs "has attempted to explain his termination by using outright lies and fabrications which seem to have their origins in delusion."  In addition, SCL and/or its affiliate, which are controlled Adelson (Adelson is chairman of the SLC board), filed a defamation complaint against Jacobs in Macau. These actions show that Adelson has already determined that the allegations in this case lack merit.  Any demand on Adelson would have been futile.

103.     Defendant Leven, in addition to being a member of the Sands Board, is also Sands' President and COO and has been since March 2009.  Defendant Leven was also SCL's acting CEO from July 2010, when Jacobs was terminated, until July 2011.   Defendant Leven's principal

occupation is his role as an executive officer and director at Sands.  In that role, defendant Leven received $12.3 million and $4.4 million in total competition in 2010 and 2009, respectively.  Given the substantial monetary compensation and other benefits Leven enjoys as a result of his positions, he is not sufficiently disinterested and independent for purposes of considering a demand. Defendant Leven is also beholden to defendant Adelson, who owns a controlling share of Sand, and is Chairman of the Company and its subsidiary SCL, from which defendant Leven receives millions of dollars in compensation.  Because a substantial portion of defendant Leven's compensation and livelihood is inextricably tied to his position in entities controlled by defendant Adelson, defendant Leven is hopelessly conflicted and incapable of exercising independent and disinterested judgment as to any demand.  Hence, demand is futile as to defendant Leven.

104.    Defendant Chafetz is similarly beholden to defendant Adelson due to his current position and his principal occupation in an entity controlled by defendant Adelson.  Defendant Chafetz is currently a manager of The Interface Group, LLC ("The Interface Group"), an entity controlled by defendant Adelson.  Accordingly, defendant Chafetz relies on defendant Adelson for his continued employment and substantial compensation, and consequently, cannot independently consider a demand against defendant Adelson.

105.    In addition, defendant Chafetz and defendant Adelson have prior professional and personal relationships that render defendant Chafetz unable to fairly and independently evaluate any demand.  From 1989 to 1995, defendant Chafetz was a stockholder, vice president, and director of The Interface Group, and reported to defendant Adelson who was the President and Chairman of The Interface Group.  Further, from 1984 to 1990, defendant Chafetz was the President of Five Star Aircraft/Airlines ("Five Star"), a division of The Interface Group.  As the President of Five Star, defendant Chafetz again reported to defendant Adelson during his tenure there.  Also, various public media outlets including the *New York Times* have published articles corroborating the close personal relationship between defendant Chafetz and defendant Adelson.  A *New York Times* article from January 17, 2008, described defendant Chafetz as a "former business partner who has known Mr.

40

Adelson since grade school."  Another publication reported that defendant Chafetz is a "lifelong friend of Mr. Adelson," and they together started a charter tours business as early as in the 1960s.  In fact, defendant Chafetz and defendant Adelson are so close that defendant Chafetz serves as the trustee of several trusts for the benefit of defendant Adelson's family members.  As such, defendant Adelson exerts considerable influence over defendant Chafetz arising from defendant Chafetz's well-documented and extensive history of positions held under defendant Adelson, and their personal relationship that span over fifty years.  Accordingly, any demand on defendant Chafetz is futile.

106.    Defendant Forman is also not independent and disinterested.  Like defendant Chafetz, defendant Adelson exercises control over the employment and compensation of defendant Forman. From 1989 to 1995, defendant Forman was the Vice President and Legal Advisor of The Interface Group, an entity controlled by defendant Adelson.  Further, defendant Forman served as an officer of both Interface Group-Massachusetts Inc., and Interface Group-Nevada, Inc., both controlled by defendant Adelson from 1989 to 1995.  Hence, defendant Forman's past, present, and future business prospects and livelihood depend on defendant Adelson and their continued relationship. Accordingly, defendant Forman cannot render independent or disinterested judgment as to any demand against defendant Adelson, and demand on him is futile.

107.    Defendants Chafetz and Forman also have considerable philanthropic ties to defendant Adelson that impair their ability to evaluate a demand independently and in a disinterested fashion.  Defendant Chafetz is the Chair of a non-profit organization, Campaign for Hebrew SeniorLife and a Trustee of SeniorLife, that is currently developing a multi-generational community in Dedham, Massachusetts.  Defendant Adelson has donated heavily to this organization.  In fact, defendant Adelson has been such a generous donor to defendant Chafetz's organization that it has decided to name its Dedham campus after defendant Adelson.  Likewise, defendant Forman was the overseer of the Beth Israel Deaconess Medical Center ("BIDMC"), which defendant Adelson pledged $2.25 million to in support of its new radiation therapy system.  As a result of defendant Adelson's significant contributions to organizations and entities managed by defendants Chafetz and

Forman, they cannot possibly evaluate independently and in a disinterested manner any potential demand to institute litigation against defendant Adelson.  Demand is futile as to defendants Chafetz and Forman for all of these reasons.

108.    In light of the foregoing, it is not surprising that at least one court has already found that defendants Adelson, Leven, Chafetz, and Forman are not independent and disinterested.  In a prior shareholder derivative case brought on behalf of Sands in the Clark County, Nevada District Court styled *In re Las Vegas Sands Corp. Deriv. Litig.*, Case No. A576669 (filed Nov. 4, 2009), the Honorable Allan R. Earl found that the plaintiffs' allegations were sufficient to construe Leven, Chafetz, and Forman as "dependent" and "beholden" to Adelson.  Although Judge Earl ultimately held that the plaintiff's allegations were insufficient to create a reasonable doubt as to the independence of the other five directors (who represented a majority of the nine-member board), he suggested that there was reason to doubt the disinterestedness and/or independence of Adelson, Leven, Chafetz, and Forman.

109.    In addition to a lack of independence based on the foregoing facts, defendants Adelson, Leven, Chafetz, and Forman all face a substantial likelihood of liability for their actions (as discussed in detail below).  These defendants are, therefore, not disinterested, and any demand upon them would have been futile.

**Demand Is Excused as to Defendants Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel Because the Entire Board Dominated and Controlled by Defendant Adelson**

110.    Demand is futile as to defendants Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel because defendant Adelson, as controlling shareholder of the Board, hand-selects the Company's directors.  Indeed, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel admitted as much in their most recent Form 10-K filed March 1, 2011:

> ***The interests of our principal stockholder in our business may be different from yours.***
>
> Mr. Adelson, his family members and trusts established for the benefit of Mr. Adelson and/or his family members beneficially own (excluding unexercised

warrants to purchase 87.5 million shares of our common stock) approximately 49% of our outstanding common stock as of December 31, 2010. Accordingly, ***Mr. Adelson exercises significant influence over our business policies and affairs, including the composition of our Board of Directors and any action requiring the approval of our stockholders***, including the adoption of amendments to our articles of incorporation and the approval of a merger or sale of substantially all of our assets. ***The concentration of ownership may also delay, defer or even prevent a change in control of our company and may make some transactions more difficult or impossible without the support of Mr. Adelson***. The interests of Mr. Adelson may conflict with your interests.

111.    In the aggregate, defendant Adelson currently controls 46.2% of the voting power of the Company, and holds considerable influence over whether each Board member will retain his seat on the Board in the next Board election. Defendant Adelson's domination and control over the Board is further demonstrated by the fact that in less than three years, he caused the Company to inexplicably force the resignation of its President and COO, Weidner, and caused SCL to terminate its CEO, Jacobs, for questioning his operation of the Company, and/or refusing to execute his unlawful directives. In fact, during Jacobs's tenure, the Company exponentially increased its market capitalization from $1.1 billion to over $19 billion. Yet, defendant Adelson still exerted his unbound influence over defendants Leven, Siegel, and Schwartz, who are all members of the SCL Board, to terminate Jacobs "for cause," because Jacobs refused his demand to engage in a course of conduct that was in violation of the federal and state laws and regulations. As such, defendants Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel cannot act independently because they are beholden to defendant Adelson for their lucrative compensation they received as directors/officers, as described below:

|  | Year | Salary | Fees Paid in Cash | Bonus | Stock Awards | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|
| Ader | 2009 |  | $50,517 |  | $50,000 | $100,000 |  | $200,517 |
| Leven | 2009 | $1,561,539 |  | $202,740 |  | $2,400,000 | $229,454 | $4,393,733 |
| Chafetz | 2009 |  | $83,776 |  | $50,000 |  |  | $133,776 |
| Forman | 2009 |  | $75,000 |  | $50,000 |  |  | $125,000 |
| Koo | 2009 |  | $66,000 |  | $50,000 |  |  | $116,000 |
| Schwartz | 2009 |  | $54,389 |  | $50,000 | $100,000 |  | $204,389 |
| Siegel | 2009 |  | $106,526 |  | $50,000 |  |  | $156,526 |

Accordingly, demand is futile as to defendants Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel because they are not independent.

43

1    Demand Is Excused as to Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and
2    Siegel Because They Face a Substantial Likelihood of Liability

3          112.    Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel as
4    members of the Board, were and are subject to the Code.  The Code went well beyond the basic
5    fiduciary duties required by applicable laws, rules, and regulations.  The Code required that
6    defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel maintain the
7    integrity of the Company and explicitly mandated that all Covered Persons, including directors,
8    comply with the FCPA and other applicable laws and regulations.  Defendants Adelson, Ader,
9    Leven, Chafetz, Forman, Koo, Schwartz, and Siegel failed to do this which violated the Code.
10   Because defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel violated the
11   Code and failed to maintain the Company's reputation, they face a substantial likelihood of liability
12   for breaching their fiduciary duties, and demand upon them is futile.

13         113.    Defendants Ader, Schwartz, and Siegel were members of the Audit Committee.  As
14   members of the Audit Committee during the relevant period, these Audit Committee Defendants had
15   additional and heightened responsibility to oversee the Company's compliance with legal and
16   regulatory requirements.   Specifically, the Audit Committee Defendants had a duty and
17   responsibility to review "the adequacy of the Company's internal controls and its procedures
18   designed to ensure compliance with laws and regulations and any special audit steps adopted in light
19   of material control deficiencies."  Thus, the Audit Committee Defendants were responsible for
20   ensuring that the Company had an adequate system of internal controls in place to prevent the FCPA
21   and state regulatory violations alleged herein.   Accordingly, the Audit Committee Defendants
22   breached their fiduciary duty of loyalty and good faith because they knowingly and recklessly failed
23   to ensure such internal controls were in place, and allowed defendant Adelson to exercise unbound
24   discretion and exert personal autonomy over the operations of the Company, which resulted in the
25   Company incurring heavy scrutiny for the violations described herein.  Thus, the Audit Committee

1  Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any

2  demand upon them is futile.

3          114.    Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel

4  breached their fiduciary duty of loyalty by failing to implement and maintain an adequate system of

5  internal controls to prevent the violation of the FCPA and state gaming regulations.   As

6  demonstrated by defendant Adelson's directives for the Company to engage in a series of misconduct

7  in direct violation of the FCPA's anti-bribery provisions and Nevada gaming regulations, the

8  Company did not have in place, and/or failed to properly implement, an effective system of internal

9  controls to check defendant Adelson's unfettered control over the Company.   These defendants

10  failure to maintain a system of internal controls to prevent a violation of applicable federal and state

11  laws and regulations is further reinforced by SCL's ongoing negotiations with Executive Council and

12  Legislative Assembly member, Alves, and his ultimate employment with the Company's subsidiary

13  while the Company's application for certain government concessions were pending before the Macau

14  government.   Accordingly, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and

15  Siegel breached their fiduciary duties in failing to implement and maintain such internal controls,

16  and face a substantial likelihood of liability.   Demand upon them is futile.

17          115.    Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel have

18  refused to take action against those who are responsible for conducting Sands' business in Macau,

19  where there is a higher risk of corruption without installing and maintaining internal controls for

20  compliance with the FCPA and state gaming regulations, including themselves.   Defendants

21  Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel have demonstrated an

22  unwillingness and inability to act in compliance with their fiduciary obligations and to sue

23  themselves or their fellow executives and allies in the top ranks of the company for the violations of

24  law complained of herein.   Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and

25  Siegel have developed professional relationships with each other, are all friends, and there exists

26  entangling financial alliances, interests, and dependencies, and therefore, they are not able to and

45

1    will not vigorously prosecute any such action.  Thus, demand on defendants Adelson, Ader, Leven,

2    Chafetz, Forman, Koo, Schwartz, and Siegel are futile, and therefore, excused.

3         116.    To properly prosecute this lawsuit, defendants Adelson, Ader, Leven, Chafetz,

4    Forman, Koo, Schwartz, and Siegel would have to sue themselves, requiring them to expose

5    themselves to tens of millions of dollars in civil liability and/or sanctions.  This they will not do.

6    Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel are exposed to

7    potential liability for operating Sands without the internal controls for compliance with the FCPA

8    and state gaming laws that would have detected and prevented the improper inducements that appear

9    to have occurred in Macau over an extended period of time, and cease the Company's ongoing junket

10   business operated and associated with Chinese organized crime.  Thus, demand on defendants

11   Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel is futile, and therefore, excused.

12        117.    Defendants Adelson, Leven, Schwartz, and Siegel were members of the SCL Board,

13   which provided them with knowledge of the Company's Macau operations, including negotiating

14   with Macau officials to obtain strata-title for The Four Seasons Apartments, addressing local

15   regulatory concerns that could potentially affect SCL business, and executive employment decision

16   such as hiring SCL's Legal Advisor.  Defendants Adelson, Leven, Schwartz, and Siegel breached

17   their duty of loyalty to SCL by knowingly, recklessly, or with gross negligence allowing SCL to

18   engage in conduct that violated the FCPA and Nevada gaming regulations.  In particular, as

19   explained above, defendants Adelson, Leven, Schwartz, and Siegel directed SCL to improperly

20   induce Macau officials to obtain favorable business results for both SCL and Sands, and instructed

21   SCL to hire Alves as its Legal Advisor, although Alves' position with the Macau government posed

22   a serious risk of non-compliance with the FCPA and Nevada gaming regulations.  Defendant

23   Adelson's directives, and defendants Leven, Schwartz, and Siegel's authorization and execution of

24   such directives, were in contravention of the FCPA and Nevada gaming regulations, and they

25   authorized the eventual hiring of Alves as SCL's Legal Advisor notwithstanding the FCPA

26   implications of his hiring.  As such, because defendants Adelson, Leven, Schwartz, and Siegel face a

1  substantial likelihood of liability for their breach of fiduciary duties to SCL, demand is futile upon

2  them.

3       118.    Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel as

4  members of the Board, have benefited, and will continue to benefit, from the wrongdoing herein

5  alleged and have engaged in such conduct to preserve their positions of control and the perquisites

6  derived thereof, and are incapable of exercising independent objective judgment in deciding whether

7  to bring this action.  Likewise, defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz,

8  and Siegel have received and will continue to receive substantial compensation predicated upon

9  Sands' results in Macau.  The acts complained of herein have resulted in economic benefits to Sands

10  (as well as to these defendants through their increased and continuing compensation) without

11  corresponding recognition or accounting for the correlated liability and risk that Sands was subject to

12  as a result of these schemes.  Defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz,

13  and Siegel through their course of conduct to date, have demonstrated their unwillingness to seek

14  appropriate relief for the overpayment of this compensation once the risk is accounted for and the

15  penalties and costs are reconciled into Sands' balance sheet.  Thus, demand on defendants Adelson,

16  Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel is futile, and therefore, excused.

17       119.    If defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel are

18  protected against personal liability for their acts of mismanagement and breach of fiduciary duties

19  alleged in this Complaint by officers' and directors' liability insurance, they caused the Company to

20  purchase that insurance for their protection with corporate funds, i.e., monies belonging to the

21  stockholders of Sands.  However, the officers' and directors' liability insurance policies covering

22  defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel in this case contain

23  provisions that eliminate coverage for any action brought directly by Sands against the defendants,

24  known as the "insured versus insured exclusion."  As a result, if the Board were to cause Sands to

25  sue themselves or certain of the officers of Sands, there would be no officers' and directors'

26  insurance protection and thus, this is a further reason why defendants Adelson, Ader, Leven,

47

1    Chafetz, Forman, Koo, Schwartz, and Siegel will not bring such a suit.  On the other hand, if the suit

2    is brought derivatively, as this action is brought, such insurance coverage exists and will provide a

3    basis for the Company to effectuate recovery.  If there is no directors' and officers' liability

4    insurance, then defendants Adelson, Ader, Leven, Chafetz, Forman, Koo, Schwartz, and Siegel will

5    not cause Sands to sue themselves, since they will face a large uninsured liability and lose the ability

6    to recover for the Company from the insurance.

7        120.    Sands has been and will continue to be exposed to significant losses due to the

8    wrongdoing complained of herein, yet Sands' Board has not filed any lawsuits against defendants or

9    others who were responsible for the wrongful conduct to attempt to recover for Sands any part of the

10   damages Sands suffered and will suffer thereby.  Thus, demand on the Board is futile, and therefore,

11   excused.

12       121.    Moreover, despite the Board having knowledge of the claims and causes of action

13   raised by plaintiffs, the current Board has failed and refused to seek to recover for Sands for any of

14   the wrongdoing alleged by plaintiff herein.

15       122.    Plaintiffs have not made any demand on the other shareholders of Sands to institute

16   this action since such demand would be a futile and useless act for at least the following reasons:

17           (a)    Sands is a publicly held company with over 726 million shares outstanding as

18   of February 18, 2011, and thousands of shareholders;

19           (b)    making demand on such a number of shareholders would be impossible for

20   plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders;

21   and

22           (c)    making demand on all shareholders would force plaintiff to incur excessive

23   expenses, assuming all shareholders could be individually identified.

24                          **FIRST CAUSE OF ACTION**
25                 **(Against All Defendants for Breach of Fiduciary Duty)**

26       123.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1

27   through 122 as though fully set forth herein.

48

124.    Each defendant owed to the Company the duty to exercise candor, good faith and loyalty in the management and administration of Sands' business and affairs, particularly in foreign countries with less developed legal and regulating frameworks, and/or which are generally perceived as having cultures that do not discourage improper payments to obtain or retain business.

125.    Defendants' conduct set forth herein was not due to an honest error or misjudgment, but rather to their intentional breach or reckless disregard of the fiduciary duties they owed to the Company, as alleged herein.  Defendants intentionally breached or recklessly disregarded their fiduciary duties to protect the rights and interests of Sands.

126.    In breach of their fiduciary duties owed to Sands, defendants willfully participated in and caused the Company to waste its valuable assets and otherwise to expend unnecessarily its corporate funds, and failed to properly oversee Sands' business, rendering them personally liable to the Company for breaching their fiduciary duties.

127.    As a direct and proximate result of defendants' breaches of their fiduciary obligations, Sands has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## SECOND CAUSE OF ACTION
### (Against All Defendants for Abuse of Control)

128.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 127 as though fully set forth herein.

129.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sands, for which they are legally responsible.

130.    As a direct and proximate result of defendants' abuse of control, Sands has sustained significant damages.

131.    As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith and loyalty, Sands has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## THIRD CAUSE OF ACTION
### (Against All Defendants for Waste of Corporate Assets)

132.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 131 as though fully set forth herein.

133.    As a result of the foregoing misconduct, defendants have caused Sands to waste valuable corporate assets.

134.    As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith and loyalty, Sands has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, defendants are liable to the Company.

## FOURTH CAUSE OF ACTION
### (Against All Defendants for Conspiracy)

135.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 134 as though fully set forth herein.

136.    Defendants, by acting in concert, intended to accomplish an unlawful objective for the purpose of harming plaintiffs; and

137.    As a direct and proximate result of the defendants' actions, Sands sustained damages resulting from defendants' acts.

## IX.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment in the Company's favor against all defendants as follows:

A.    Declaring that plaintiffs may maintain this action on behalf of Sands and that plaintiffs are an adequate representative of the Company;

B.    Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Sands;

C.    Determining and awarding to Sands the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

50

1        D.      Determining and awarding to Sands exemplary damages in an amount necessary to

2  punish defendants and to make an example of defendants to the community according to proof at

3  trial;

4        E.      Awarding Sands restitution from defendants, and each of them;

5        F.      Awarding plaintiffs the costs and disbursements of this action, including reasonable

6  attorneys' and experts' fees, costs and expenses; and

7        G.      Granting such other and further equitable relief as this Court may deem just and

8  proper.

9  / / /

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

1

## X.     JURY DEMAND

Plaintiffs demand a trial by jury.                    REISMAN SOROKAC

                    DATED:  November 21, 2011

/s/ Joshua H. Reisman, Esq.
JOSHUA H. REISMAN, ESQ.
Nevada Bar No. 7152
Robert R. Warns III, Esq.
Nevada Bar No. 12123
8965 S. Eastern Avenue, Suite 382
Las Vegas, Nevada 89123
Telephone: (702) 727-6258
Facsimile: (702) 446-6756
Email: jreisman@rsnvlaw.com
Email: rwarns@rsnvlaw.com

Liaison Counsel for Plaintiffs

KENDALL LAW GROUP, LLP
JOE KENDALL (Texas State Bar No. 11260700)
JAMIE J. MCKEY (Texas State Bar No. 24045262)
DANIEL HILL (Texas State Bar No. 24072149)
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
Fax:  214/744-3015

Lead Counsel for Plaintiffs
Admitted Pro Hac Vice

2

3

1

2

3

4

5

6

7

8

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all counsel registered to receive such notice.

/s/ Robert R. Warns III, Esq.
ROBERT R. WARNS III, ESQ.
an Employee of REISMAN·SOROKAC