**MTD**
MORRIS LAW GROUP
Steve Morris, Bar No. 1543
Email: sm@morrislawgroup.com
Akke Levin, Bar No. 9102
Email: al@morrislawgroup.com
Raleigh C. Thompson, Bar No. 11296
Email: rct@morrislawgroup.com
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, NV 89101
Telephone: (702) 474-9400
Facsimile: (702) 474-9422

Richard A. Sauber (*Pro Hac Vice*)
Email: rsauber@robbinsrussell.com
Kathryn S. Zecca (*Pro Hac Vice*)
Email: kzecca@robbinsrussell.com
Ariel N. Lavinbuk (*Pro Hac Vice*)
Email: alavinbuk@robbinsrussell.com
Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP
1801 K Street, N.W. Suite 411L
Washington, D.C. 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510

Attorneys for Defendants

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| NASSER MORADI, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>SHELDON GARY ADELSON, et al.,<br><br>    Defendants. | Case Nos. 2:11-cv-490-MDD-RJJ (base); 2:11-cv-595 (related); 2:11-cv-636 (related)<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS** |

## I. INTRODUCTION

Plaintiffs' Opposition is more notable for what it fails to argue than what it does. Plaintiffs concede that their alleged damages are costs associated with ongoing investigations sparked by the claims of a disgruntled former employee, and that those investigations have resulted in no finding of illegality, no filing of government claims, nor any settlement by Las Vegas Sands Corp. ("LVS" or the "Company"). What is more, Plaintiffs fail to demonstrate that any of the former employee's allegations (if proven) actually constitute illegal conduct. Nor do Plaintiffs contest that this case is nearly identical to an earlier-filed shareholder derivative suit that is currently pending in Clark County's Business Court.

Each of these concessions is independently fatal to Plaintiffs' claims. The Amended Complaint should be dismissed.

## II. ARGUMENT

### A. The Amended Complaint Fails To State A Claim Because The Damages It Seeks Are Speculative

Plaintiffs do not dispute that they seek to recover for the three types of harm identified in Defendants' motion to dismiss ("Mot.") (at 7-11). None of these alleged harms, however, is ripe for review.[1] They are "fatally speculative" because the Company has not been held liable for violating any law or regulation—and it may never be. *Xinos v. Kappos*, 270 F. Supp. 2d 1027, 1031 (N.D. Ill. 2003). For this reason alone, the Court should dismiss the Amended Complaint.

---

[1] The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). It "merges almost completely with standing" insofar as it is concerned with "whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical." *Id*.

[2] It is for the same reason that Plaintiffs cannot meet their burden by simply

1. Plaintiffs do not even defend their claim for "*potential* fines and sanctions" resulting from "*potential* violations of the FCPA" that regulators themselves have never even alleged, let alone proven. Cplt. (Dkt. 78) ¶¶ 72, 15. *See also id*. ¶ 93(f)-(g). And no wonder: where "no judgment has been rendered, nor a settlement reached, . . . no injury has been sustained for which plaintiff may sue to recover." *In re Symbol Technologies Securities Litigation*, 762 F. Supp. 510, 516 (E.D.N.Y. 1991).

2. Plaintiffs at least attempt to defend their claimed damages based on a supposed impairment to the Company's "business, goodwill, and reputation" resulting from the charges "implicat[ing]" the Company "in improper behavior." Cplt. ¶¶ 94, 95. As we explained in our motion (at 10-11), however, "this type of boilerplate language is not sufficient to withstand a motion to dismiss." *Symbol Tech.*, 762 F. Supp. at 517. Plaintiffs' entire response, however, is based on *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs.*, 854 A.2d 121 (Del. Ch. 2004), in which Plaintiffs concede that the "defendants . . . did not argue that plaintiff's claims were not ripe." Opp'n at 15. Moreover, there is no reason to believe that the *Metro* complaint suffered from the deficiencies in the Complaint here. In particular, the alleged reputational injuries there—that "[p]otential investors refused to participate in financing rounds, and IPO plans were scuttled" (*id.* at 137)—may meet the specificity requirements detailed in *Symbol Tech*. No such argument can be made here, as Plaintiffs seem to concede.

3. The only claimed damages that Plaintiffs meaningfully defend is their request for investigatory costs (Cplt. ¶ 93(a)-(c); Opp'n at 14), but their argument on that front is, ultimately, no more successful than no defense at all. Citing *In re Cendant Corp. Derivative Action Litig.*, 189 F.R.D. 117, 135 (D.N.J. 1999), Plaintiffs assert that "[e]xpenses incurred in

connection with investigations and legal fees are cognizable damages in a shareholder derivative action like this one." Opp'n at 14. But, as we noted in our motion (at 10), *Cendant* differs from this case in a critical respect emphasized by the *Cendant* court itself: The derivative action there sought to recover damages arising from the *settlement* of related litigation. *See* 189 F.R.D. at 135 ("[U]nlike *Symbol Technologies,* Cendant has already incurred legal expenses and issued almost $350 million in securities to settle the *Prides* litigation."). Defendants do not dispute that expenses incurred to settle litigation may sometimes constitute cognizable harm to a corporation, but "defendants cannot be held liable for the costs of defending a potentially baseless suit" or investigation. *Symbol Technologies*, 762 F. Supp. at 516.[2] Because the Company has not paid—and may never pay—a dime to settle matters related to this case, any expenses incurred to-date do not constitute cognizable harm.

No doubt recognizing that this distinction is fatal to the Amended Complaint, Plaintiffs assert that every case Defendants cite is distinguishable from this one because "[i]n those cases, the plaintiffs did not assert any claims for damages that had already been sustained," whereas "[h]ere, in contrast, Plaintiffs allege damages that Sands has already sustained, including costs incurred in connection with investigations and legal fees." Opp'n at 15. That assertion is not only factually incorrect,[3] but it misrepresents the holdings of those cases as well:

---

[2] It is for the same reason that Plaintiffs cannot meet their burden by simply alleging (at 12-13) that "if Defendants had fulfilled their duties to implement the FCPA-mandated accounting controls . . . Sands would not be the subject of investigations for any FCPA violation."

[3] *See, e.g.*, *Isolagen*, 2007 WL 1101278, at *2 (seeking recovery for "the costs of internal investigations, including accounting fees and legal fees, and the costs and legal fees for defending the related securities class action

*None* of those courts found the incidence of investigatory costs, in and of itself, sufficient to state a claim for damages. Instead, rather than focusing on whether or not the claimed damages had already been incurred (as Plaintiffs claim), those courts focused on whether the related matter at issue was still pending (as is the case with the investigations here) or had gone to judgment or been settled (as in *Cendant*).

Plaintiffs' citation to *Isolagen* is particularly disingenuous given that the court there ***explicitly rejected*** the theory that Plaintiffs attribute to it here. As the Court noted, plaintiffs there (as here), "argue[d] that some of the damages Isolagen and its shareholders are suffering are 'real and present—not contingent.'" 2007 WL 1101278, at *2 (citing plaintiffs' brief in opposition). But "the Court d[id] not find [that distinction] persuasive." *Id*. Though a plaintiff might recover for expenses where a related matter has been finalized, there (as here) the related matter "ha[d] not been dismissed, settled, or a judgment entered." *Id*. Accordingly, ***all*** of the damages that plaintiff sought to recover were premature. So too here.[4]

### B. The Amended Complaint Also Fails Under Rule 8 Because It Is Not Plausible On Its Face

As we argued in our motion (at 12-19), the Amended Complaint suffers from a second fatal defect: Its vague, conclusory, and often

---

lawsuits"); *Symbol Tech.*, 762 F. Supp. at 516 (seeking recovery "for *all* costs incurred in defending the class action") (emphasis added); *In re Cray Inc.*, 431 F. Supp. 2d 1114, 1133 (W.D. Wash. 2006) (seeking recovery for "[c]osts incurred to carry out internal investigations of, and defend against, potential legal liability from the pending class action lawsuit").

[4] Plaintiffs' request (at 21) for further leave to amend should be denied. Plaintiffs already amended their complaint after Lead Counsel was appointed. *See* Dkt. 78 (Consolidated *Amended* Complaint). Moreover, because the Company has neither been convicted of (or even charged with) wrongdoing nor settled matters with the government, there are no actual damages that Plaintiffs could plead in a second amended complaint.

undifferentiated allegations regarding Defendants' conduct do not meet the pleading requirements of Rule 8. No one disputes that, under Rule 8, "a complaint need only state a claim for relief that is 'plausible on its face.'" Opp'n at 6 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But that standard has more teeth than Plaintiffs care to acknowledge. It "asks for more than a sheer *possibility* that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (emphasis added). Indeed, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*.

That is the case with the Amended Complaint here for one simple reason. Time and again Plaintiffs conclusorily assert that the Company has violated the FCPA or other laws. But when pressed to actually identify that violation—or even allegations that could amount to a violation—Plaintiffs have nothing to say.

> **1.  Plaintiffs fail to state a claim that Adelson breached his fiduciary duty of loyalty by engaging in unlawful conduct because the actions they allege Adelson to have taken do not violate any law**

The Amended Complaint alleges that Adelson fired an executive of the Company's Macau subsidiary, for "refusing to comply with . . . demands to engage in illicit business practices." Cplt. ¶ 13. The central proposition of Plaintiffs' case is that these "demands . . . would have violated the FCPA," thereby constituting a breach of his fiduciary duties. *Id*. As we explained in our motion (at 12-15), however, none of the demands that Adelson is alleged to have made constitute a violation of the FCPA. Each lacks at least two (and often more) of the six elements of a

FCPA violation. *See United States v. Jefferson*, 594 F. Supp. 2d 655, 667 (E.D. Va. 2009).[5]

Plaintiffs dispute none of this. They do not contest our reading of the law, nor do they defend the adequacy of the allegations in their complaint. Almost entirely abandoning the FCPA, they instead argue that they "do not assert a claim against Adelson for violation of [that statute]," but rather "have pled a claim for breach of the fiduciary duty of loyalty." Opp'n at 8.[6]

That is no response at all. As Plaintiffs readily admit, the particular breach of the fiduciary duty of loyalty they alleged is that Adelson "engage[d] in unethical and unlawful practices." Opp'n at 7. Plaintiffs are undoubtedly correct that *one* thing they need to plead—and ultimately prove—in order to state their claim is that Adelson "pursued profits at the expense of complying with the law." Opp'n at 7. But that is not the *only* thing they need to do: They also need to plead—and ultimately prove— what the unlawful activity at issue is. *See*, *e.g.*, *McCall v. Scott*, 239 F.3d 808,

---

[5] Stating a claim under the FCPA requires allegations that the "defendant is [1] a domestic concern [2] that made use of a means or instrumentality of interstate commerce [3] corruptly [4] in furtherance of an offer or payment of anything of value to any person [5] while knowing that the money would be offered or given directly or indirectly to any foreign official [6] for purposes of influencing any act or decision of such foreign official in his official capacity." *Jefferson*, 594 F. Supp. 2d at 667.

[6] Plaintiffs (at 7) spin a theory that Adelson violated the FCPA in connection with the Company's attempt to sell strata-title to the Four Seasons Apartments—relying on the first and second allegedly "unlawful" demands that Adelson made of Jacobs (Cplt. ¶ 14)—but they offer no response to our argument (Mot. at 13-15) that the theory fails to allege at least three of the six elements of an FCPA violation, among them: (1) that the challenged conduct involved an offer or payment of something of value, (2) which government officials the alleged offers were intended to influence, and (3) that the conduct made use of a means or instrumentality of commerce.

813, 825 (6th Cir. 2001) (claim for "breach of the fiduciary duty of loyalty by illegal insider trading" requires pleading and proving insider trading).[7] To require anything less would be to "permit the court to infer more than the mere possibility of misconduct" based only on "labels and conclusions"—which Rule 8 strictly forbids. *Iqbal*, 556 U.S. at 678.[8]

Nor does it suffice for Plaintiffs to point to "the existence of a pending government investigation . . . to 'bolster the plausibility' of [their claims]." Opp'n at 9. "A plaintiff may surely rely on governmental investigations, but must also, under FRCP 11, undertake his own reasonable inquiry and frame his complaint with allegations of his own design." *In re Tableware Antitrust Litig.*, 363 F. Supp. 2d 1203, 1205 (N.D. Cal. 2005). "Simply saying 'me too' after a governmental investigation does not state a claim." *Id*. "[I]f it [did], mere knowledge of a governmental investigation would suffice—without any further inquiry on a would-be plaintiff's part—to expose the targets of such investigations to free-ranging civil discovery." *Id*. "This cannot be so." *Id*. And yet that is exactly what Plaintiffs here seek to do by relying almost exclusively on

---

[7] Plaintiffs' reliance (at 8) on *Metro*, which was decided five years before *Iqbal*, is again misplaced as the court did not address whether, under Rule 8, a plaintiff bringing a fiduciary duty claim based on unlawful activity must identify and allege the elements of that unlawful activity. In any event, the plaintiffs in *Metro* (unlike here) apparently did identify both the corrupt amounts offered ("$2 million") and the means or instrumentality of commerce used to do so (a transfer "from an account at Commercial Bank in New York to local officials in Sao Paolo"). 854 A.2d at 134.

[8] Nor is it sufficient for Plaintiffs to allege simply that Adelson committed "bribery." As we noted in our motion (at 14), U.S. law does not "criminalize[] every payment to a foreign official." *United States v. Kay*, 359 F.3d 738, 760 (5th Cir. 2004). In order to allege unlawful activity, Plaintiffs need to allege the elements of a FCPA violation—which they all but admit they do not do.

disclosed government investigations and second-hand allegations from a still-pending wrongful termination suit to get into court.

### 2. Plaintiffs fail to state a claim that the Defendants consciously disregarded illegal conduct

Piggybacking off their (insufficient) allegations against Adelson, Plaintiffs allege (at 4) that the entire Board "failed to implement and maintain adequate internal controls . . . which would have prevented the type of bribery and improper business practices Adelson caused the Company to engage in." Plaintiffs assert that these purported failures constitute a breach of the fiduciary duty of loyalty because the Board "consciously fail[ed] to act in the face of a known legal duty"—a "framework" for establishing breach that, they assert, was "outlined in *Stone ex rel AmSouth Bancorporation v. Ritter* ('*AmSouth*'), 911 A.2d 370 (Del. 2006). Opp'n at 9 ("To state a claim under *AmSouth*, Plaintiffs need only plead that: (i) the Defendants had a known duty to implement internal controls; and (ii) in the face of that duty, they 'utterly failed' to put those controls in place.").

But *AmSouth* established no such framework. To the contrary, it simply affirmed the dismissal of a breach claim based on *In re Caremark Int'l Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996), which "articulates the necessary conditions for assessing director oversight liability." *AmSouth*, 911 A.2d at 365. Under *Caremark*, 698 A.2d at 971,

> in order to show that . . . directors breached their [fiduciary] duty . . . plaintiffs would have to show either (1) that the directors knew or (2) should have known that violations of law were occurring and, in either event, (3) that the directors took no steps in a good faith effort to prevent or remedy that situation, and (4) that such failure proximately resulted in the losses complained of.

Page 9 of 19

Far from redefining the elements of a failure-of-oversight claim, the language from *AmSouth* that Plaintiffs cite is simply *dicta* concerning the third element of such a claim. Nothing in *AmSouth* suggests that a claim can be stated without alleging *all* of the elements identified in *Caremark*—which Plaintiffs do not do. *See* Mot. at 16-19.

*First*, because the corporation has not sustained any cognizable injury (*supra* Part I), Plaintiffs cannot establish the fourth, proximate-cause element of a *Caremark* claim.

*Second*, Although Plaintiffs describe (at 10) the requirements that the FCPA and other laws place on companies doing business abroad—a proposition no one contests—they do not identify the "violations of the law" that the directors here "knew or should have known" about, *i.e.*, the first and second elements of a *Caremark* claim. Although Plaintiffs conclusorily argue that the Company did not have sufficient internal controls mandated by the FCPA (Opp'n at 11), they fail to specify a single control required by FCPA (or any other law) that the Company failed to implement. Indeed, to the contrary, the Complaint identifies a host of internal controls that the Board *has* put into place, among them a Code of Business Conduct. The Complaint also acknowledges that "[t]he Audit Committee met eight times during 2008, and five times during 2009." Cplt. ¶¶ 41-42. As in *AmSouth*, these allegations are fatal to Plaintiffs' claims because they "reflect[] that the directors not only discharged their oversight responsibility to establish an information and reporting system, but also proved that the system was designed to permit the directors to periodically monitor [the Company's] compliance with [applicable] regulations." 911 A.2d at 371-372.

If anything, the complaint here is weaker than the one dismissed in *AmSouth* because Plaintiffs do not point to a FCPA violation that occurred

as a result of the purported lack of controls, nor do they identify who committed that violation.[9]  For example, Plaintiffs do not allege a single instance in which the Company violated the "books and records" described in their papers (at 10).[10]

*Third*, whatever the "violations of the law" at issue here are, Plaintiffs fail to allege that each Defendant consciously ignored a duty to act on them, *i.e.,* the third element of a *Caremark* claim.  Oversight liability is widely recognized as "the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," in part because it "require[s] a finding that the directors acted with . . . bad faith." *Desimone v. Barrows*, 924 A.2d 908, 939, 935 (Del. Ch. 2007).  To establish this state of mind, "a derivative complaint must plead facts *specific to each director*." *Id*. at 935 (emphasis added).  As we demonstrated in our motion (at 17), the Complaint is entirely devoid of facts establishing these elements.

Instead, Plaintiffs seemingly assert that the fact that the Company is now "the subject of an investigation for violating the FCPA" is, in and of

---

[9] To the extent Plaintiffs base this claim on Adelson's demands to a former executive, it fails for reasons already explained, *supra* Part II.B.1.

[10] Plaintiffs' argument (at 13) that Defendants Leven, Siegel, and Schwartz "knew (or recklessly disregarded) that unlawful conduct was occurring" fails for the same reason.  The issue here is not a director's obligation in the face of "widespread illegal conduct." *Ryan v. Lyondell Chem. Co.*, 2008 WL 4174038, at *3 (Del. Ch. Aug. 29, 2008).  It is that no such illegal conduct has been sufficiently alleged.

Plaintiffs' citation to *In re Massey Energy Co.*, No. 5430-VCS, 2011 WL 2176479 (Del. Ch. May 31, 2011), is misplaced for the same reason.  There, quite unlike here, "[t]he objective facts [were] that Massey had pled guilty to criminal charges, had suffered other serious judgments and settlements as a result of violations of law, had been caught trying to hide violations of law and suppress material evidence, and had miners suffer death and serious injuries at its facilities." *Id*. at 20.  Not so here.

itself, sufficient proof that each Defendant breached its duties. This theory has been squarely rejected by those courts that have considered it. For example, in *Freuler v. Parker*, 803 F. Supp. 2d 630 (S.D. Tex. 2011), shareholders brought suit alleging that officers and directors "failed to adequately oversee corporate compliance activities that were . . . in violation of the Foreign Corrupt Practices Act . . . and, indeed, even authorized improper payments to the Company's employees . . . to allow them to participate in such illegal activities." *Id*. at 633. As here, Plaintiffs pled that the defendant-directors must have had knowledge of improper payments because "of the high probability" that such payments would be necessary to do business in countries like Kazakhstan and Nigeria. *Id*. at 641. As here, the Company's activities "were investigated by federal authorities." *Id*. at 642. And, as here, Plaintiffs complained that those investigations, and the allegedly improper activities that precipitated them, caused damage to the Company's "goodwill and reputation" and caused it to "incur[] significant expenses, over $20 million, investigating such illegal activities." *Id*.

The Court nevertheless dismissed the action, observing that "courts, applying Delaware law, view oversight liability very narrowly." *Id.* at 649. The Court observed that "Plaintiff assumes that because a FCPA investigation of potential non-compliance is ongoing, Parker Drilling must be culpable, but no conclusions of wrongdoing have been reached. Even where wrongdoing can be shown, it must still be known to and ignored by the directors before an oversight claim is actionable." *Id*. at 649. Specifically, that would require a Plaintiff to allege

> how each Individual Defendant knew the Company was violating internal controls it had in place for compliance with the FCPA and how and why they were inadequate, what controls were violated, when, how and by whom, how the

Directors gained this knowledge, [and] what they should have done to the controls to make them more effective, etc.

*Id.* at 650-651.  Plaintiffs have failed to do so here, and so the Amended Complaint should be dismissed.

### C. This Case Should Be Dismissed Or Permanently Stayed Under *Colorado River*

This case is nearly identical to an earlier-filed case pending in Clark County's Business Court.  Accordingly, *Colorado River* abstention is warranted by the "exceptional circumstances" present here, in particular, the special concerns regarding piecemeal litigation that arise with parallel derivative suits (*see* Mot. at 21-23), the lack of a federal interest in this case (*see id.* at 24-26), and the existence of an earlier invoked state forum that was specially created to address the kinds of issues raised in this litigation (*id.* at 23-24).  *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976); *Hussein v. Fushi Copperweld, Inc.*, No. 3:10-CV-0699-LRH-RAM, 2011 WL 1344257 (D. Nev. Apr. 7, 2011).  Plaintiffs' opposition does little more than repeatedly invoke the "exceptional circumstances" requirement, without addressing the circumstances present in *this* case.

#### 1. The derivative nature of this litigation creates exceptional concerns regarding piecemeal litigation

It is well established that "piecemeal or purely duplicative litigation and the concomitant waste of judicial resources" is "[t]*he overriding concern* expressed in *Colorado River*."  *Inn Chu Trading Co., Ltd. v. Sara Lee Corp.*, 810 F. Supp. 501, 508 (S.D.N.Y. 1992) (emphasis added).  Plaintiffs assert (at 17), incorrectly, that "Defendants contend that the mere existence of two similar concurrent cases weighs in favor of dismissing or staying this Action."  But Defendants make a substantially narrower point:  There are a number of special characteristics *specific to derivative suits*—and to this one in particular—that heighten concerns about piecemeal litigation.

As we argued (Mot. at 22), permitting multiple derivative actions to proceed simultaneously subjects the real-party-in interest, the Company, to the possibility of inconsistent rulings, both on critical interlocutory issues and at final judgment. *See Ash v. Alexander*, No. 99-CIV-3820, 2000 WL 20704 (S.D.N.Y. Jan. 12, 2000). Indeed, as Plaintiffs concede, the risk of inconsistent ruling is present *right now*, as the state court is already considering Defendants' motion to dismiss for prematurity and failure to state claim.[11] *Cf.* Opp'n at 17 ("any risk of inconsistent rulings [is] a nonissue"). "If th[is] court decided to exercise jurisdiction, it would have to decide these matters anew, requiring duplicative effort and creating a strong possibility of inconsistent results." *Am. Int'l Underwriters (Philippines), Inc. v. Cont'l Ins. Co.*, 843 F.2d 1253, 1258 (9th Cir. 1988). Nor does it suffice to say, as Plaintiffs do (at 18), that "the risk of inconsistent judgments can be obviated through *res judicata*." "While the doctrine of *res judicata* largely obviates the risk of conflicting final dispositions on the merits, a significant risk of conflict attends interlocutory rulings that are not ordinarily entitled to preclusive effect." *Lumen Const., Inc. v. Brant Const. Co., Inc.*, 780 F.2d 691, 694 (7th Cir. 1985) (citing 1B MOORE'S FEDERAL PRACTICE ¶ 0.441[4]).[12]

Plaintiffs rely almost exclusively on the Ninth Circuit's decision in *Travelers Indem. Co. v. Madonna*, 914 F.2d 1364 (9th Cir. 1990). But *Travelers*

---

[11] The matter was fully briefed on December 13, 2012, and argued on January 10, 2013.

[12] "To take a fairly pedestrian example, the state and federal courts may issue contradictory orders on discovery matters. This single, simple conflict, on matters ordinarily within the trial courts' broad discretion, leads ineluctably to a 'rush to judgment,' with each side attempting to push forward the litigation in the forum ruling in its favor on the preliminary matter. In the end, the forum that loses the race will have engaged in a grand waste of efforts." *Lumen Const.*, 780 F.2d at 694.

was not a shareholder derivative action and it raised none of the issues that Defendants have noted. As the Ninth Circuit emphasized, *Travelers* was a "case involv[ing] ordinary contract and tort issues," *id*. at 1369, a central factor to the decision that district courts hearing shareholder suits like this one have since emphasized. *See, e.g.*, *Krieger v. Atheros Communications, Inc.*, 776 F. Supp. 2d 1053, 1062 (N.D. Cal. 2011) (distinguishing *Travelers* because "concerns about piecemeal litigation are heightened in *this* case due to the complexity of the litigation [and] the presence of [shareholder] class-action claims").

A heightened threat of inconsistent rulings is not the only special concern raised by piecemeal litigation in the derivative context. Problems associated with duplicative discovery, depositions, and motion practice also take on a new character in the derivative context. *See* Mot. at 8-9. As one court observed:

> In the derivative context, the expense to the corporation must be considered because the real party in interest is the corporation. Indeed, the corporation pays the fees to defend the action, to indemnify the individual defendants, and often, also the fees for the plaintiff shareholders who brought the action. The multiplicity of litigating actions that are undisputedly exactly the same multiplies the expense to the corporation, in time, money, and resources.

*Shallal v. Elson*, No. 98-8739-CIV, 1999 WL 33957906, at *4 (S.D. Fla. Apr. 12, 1999). *See also Giles*, 789 F. Supp. 2d 706, at *5 (emphasizing the "substantial burden" posed by "duplicative discovery requests and markedly different general litigation schedules in each court"); *Day v. Union Mines Inc.*, 862 F.2d 652, 659 (7th Cir. 1988) ("the possibility of sharing discovery on parallel issues does not alleviate that waste of judicial resources since the two forums see each case uniquely and must hear

evidence and arguments on each point raised throughout the course of the litigation, no matter how routine it becomes for counsel").

Plaintiffs do not (and cannot) deny these very real costs; they simply assume, without support, that their own interest in filing their own lawsuit in this Court outweighs the costs ultimately borne by shareholders writ large. That assumption, however, is unwarranted. As the Second Circuit observed in a related context, "[s]pecial treatment is often called for in stockholders' derivative actions where the stockholder sues, not in his own right, but in that of the corporation and on [b]ehalf of his fellow stockholders." *MacAlister v. Guterma,* 263 F.2d 65, 68 (2d Cir. 1958). "The cost of litigating two separate derivative actions will ultimately be borne by shareholders of the company, both in payment of legal fees and the distraction of company management." *Dolphin Ltd. P'ship I, L.P. v. Gupta*, No. CIV.A. 1956-N, 2007 WL 315864, at *1 (Del. Ch. Jan. 22, 2007). Indeed, "the cost of defending these multiple actions may well do serious harm to the very corporation in whose interest they are supposedly brought." *Horn v. Raines*, 227 F.R.D. 1, 2 (D.D.C. 2005) (quoting *MacAlister*, 263 F.2d at 68).

Plaintiffs' sole retort to the special concerns about piecemeal litigation raised in the context of derivative litigation appears to be a footnote (Opp'n at 18 n.17) quoting *dicta* from *Brown v. Moll*, No. 3:09-cv-05881, 2010 WL 2898324, at *4 (N.D. Cal. July 21, 2010). Far from offering a reasoned rejection of Defendants' arguments, however, the court in *Brown* was merely observing that the Seventh Circuit, in a different case—*Clark v. Lacy,* 376 F.3d 682, 687–88 (7th Cir .2004)—had relied on a different legal principle to support its decision to affirm a district court's abstention. Nothing in that opinion rejects the factors cited here as valid reasons supporting abstention.

## 2. This case raises claims that exist only under state law and there are no federal interests implicated by hearing this case in state court

Under *Colorado River*, "when state law claims are presented in both a state court and a federal court, it may be appropriate for the federal court to refuse to take jurisdiction of the federal suit." *Int'l Jensen Inc. v. Emerson Radio Corp.*, No. 96 C 2816, 1996 WL 494273, at *3 (N.D. Ill. Aug. 27, 1996); *see* Mot. at 24-25. Here, the gravamen of Plaintiffs' claims is that the Company's directors breached their fiduciary duties to shareholders by "fail[ing] to implement and/or maintain adequate internal controls to prevent violations" of the law. Cplt. ¶ 15. Though the law Plaintiffs allege Defendants to have violated is federal, even when a state "looks to federal law as a guidepost in assessing a breach of fiduciary duty . . . that assessment ultimately remains a creature of [that state's] law." *Donovan v. Rothman*, 106 F. Supp. 2d 513, 518 (S.D.N.Y. 2000).

Plaintiffs do not (and cannot) dispute that this Court could abstain on these grounds, and that other courts have done so—indeed, they do not even acknowledge, let alone attempt to distinguish, the cases upon which Defendants relied in their motion. Instead, and notwithstanding the undisputed lack of a federal claim in this case, Plaintiffs argue (at 21) that abstention is not appropriate because "there can be no question that federal interests are at issue in this case."

But the mere presence of federal-law issues does not mean there are "federal interests" at stake. "[T]he FCPA does not provide private plaintiffs with a cause of action," *Grynberg v. BP P.L.C.*, 585 F. Supp. 2d 50, 54 (D.D.C. 2008), and "the absence of a federal private right of action [i]s evidence relevant to" whether Congress believes a federal interest is at stake (*Grable & Sons Metal Products, Inc. v. Darue Eng. & Mfg.*, 545 U.S. 308, 318 (2005)). Indeed, the legislative history makes clear that cases such as

this one are actually *at odds* with the federal scheme for enforcing the FCPA. *See Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1028-29 (6th Cir. 1990) ("the introduction of private plaintiffs interested solely in post-violation enforcement . . . most assuredly would hinder congressional efforts" to do so). If anything, federal interests cut *against* hearing this case.

### 3. The remaining *Colorado River* factors weigh in favor of abstention

The *Colorado River* factors present here are indistinguishable from those that recently led Judge Hicks to abstain in *Hussein*, *supra*. *See* Mot. at 26-27. In *Hussein*, as here, shareholders filed multiple suits in federal and state court alleging a breach of fiduciary duties. There, as here, the state cases were filed first, and were brought in "the Clark County Business Court, . . . [which] is specifically designed to handle shareholder actions and other business torts." 2011 WL 1344257, at *2. There, as here, "declining to exercise jurisdiction in this action would avoid piecemeal litigation because this court would no longer be duplicating the efforts of the state court in addressing identical claims." *Id*. And finally, there, as here, "all claims in th[e] action [were] brought pursuant to Nevada law." *Id*. As Judge Hicks concluded in dismissing the federal case before him, on the basis of these factors "it would be a misuse of judicial resources to exercise jurisdiction over this duplicative proceeding when the state court is well-prepared to proceed." *Hussein*, 2011 WL 1344257, at *2. So too here.

Plaintiffs attempt (at 21) to distinguish *Hussein* on the ground that it involved a shareholder class action and not a shareholder derivative suit, but they fail to explain how that distinction impacts any of the factors cited by Judge Hicks. To the contrary, the fact that *Hussein* was not a derivative suit only further supports Defendants' position because it demonstrates that a Court *in this District* has very recently abstained from exercising

jurisdiction over a shareholder dispute where the special concerns particular to derivative suits explained in Defendants' motion and this reply are not even present. *See also Commercial Cas. Ins. Co. v. Swarts, Manning & Assocs.*, 616 F. Supp. 2d 1027 (D. Nev. 2007) (dismissal under similar circumstances). Simply put, there is no reason for either the Company, or this Court, to expend limited resources adjudicating a state-law case that is already proceeding in state court.

MORRIS LAW GROUP

By   /s/ Raleigh C. Thompson
Steve Morris, Bar No. 1543
Akke Levin, Bar No. 9102
Raleigh C. Thompson, No. 11296
900 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101

Richard A. Sauber (*Pro Hac Vice*)
Kathryn S. Zecca (*Pro Hac Vice*)
Ariel N. Lavinbuk (*Pro Hac Vice*)
Robbins, Russell, Englert, Orsek,
 Untereiner & Sauber
1801 K Street, N.W. Suite 411L
Washington, D.C. 20006

Attorneys for Defendants

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of MORRIS LAW GROUP and that the following document was served via electronic service:

TO:

Joshua H. Reisman
jreisman@rsnvlaw.com
Robert R. Warns III
8965 South Eastern Avenue
Suite 382
Las Vegas, NV  89123

Daniel Hill
dhill@kendalllawgroup.com
Elton Joe Kendall
administrator@kendalllawgroup.com
Jamie J. McKey
administrator@kendalllawgroup.com
Kendall Law Group, LLP
3232 McKinney Avenue
Dallas, TX  75204

Attorneys for Plaintiffs

DATED this 18th day of January, 2013.

By     /s/ Heather Suter